(No. 15480.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ARTHUR KIRCHER, Plaintiff in Error.

*Opinion filed October 20, 1923.*

1. CRIMINAL LAW—*a confession is not the same as an admission of incriminating facts.* A confession is a voluntary admission or declaration by a person of his agency or participation in a crime and is an acknowledgment of guilt and not merely of incriminating facts, as an incriminating admission may be made without any intention of confessing guilt.

2. SAME—*what incriminatory statements are admissible.* Incriminatory statements made by the defendant at the hospital in the presence of the coroner and State's attorney are admissible against him without preliminary proof of their having been voluntarily made, where they do not admit guilt but only that the defendant was at the scene of the crime for an alleged wholly innocent purpose and was shot by the deceased before he shot at the latter.

3. SAME—*condition of defendant at time he made incriminatory statements may be considered by jury.* The facts that the defendant, at the time he made the incriminatory statements testified to, was suffering from a wound and the after-effects of an anæsthetic and that the witnesses do not entirely agree as to what he said, are proper to be considered by the jury in determining what weight shall be given to his statements.

4. SAME—*when cartridges found in defendant's pocket are admissible.* Cartridges found in the pocket of the defendant at the hospital soon after the shooting which were of .32 caliber are admissible in evidence, where the evidence is that the fatal wound in the body of the deceased was made by either a .32 or .38 caliber bullet, which went through the body of the deceased and was not found.

5. SAME—*when evidence of burglary of box-car is admissible in murder trial.* On a trial for murder of a railroad yard night watchman, whose body was found a few yards away from a burglarized box-car near which the defendant's admissions tend to show he was when he exchanged shots with the watchman, evidence that the car was burglarized, that there was a fusillade of shots in that neighborhood, and that many empty shells were found upon the ground there, is admissible though there is no direct evidence to connect the defendant with the burglary.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. T. N. GREEN, Judge, presiding.

C. E. McNEMAR, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ERNEST J. GALBRAITH, State's Attorney, EDWARD C. FITCH, and REN L. THURMAN, for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

Fred Wells was shot and killed a few minutes after five o'clock on the morning of December 3, 1921. Arthur Kircher was indicted for the murder by the grand jury of Peoria county, and upon a trial at the April term, 1922, was found guilty and sentenced to imprisonment in the penitentiary for fourteen years. He has sued out a writ of error to reverse the judgment.

The deceased was a special officer employed by the Chicago, Burlington and Quincy Railroad Company to guard the freight cars and property of the company in the railroad yards at Peoria. He was seen about 12:30 A. M. on December 3, 1921, when he ate his lunch, which was brought to him at the foot of Edmund street, about four and a half blocks from the Chicago, Burlington and Quincy freight house, by Clarence Averell, a night watchman. He was last seen alive about five o'clock the same morning by Henry Beam, a car cleaner for the Chicago, Burlington and Quincy Railroad Company at the Union station, about two blocks from the freight house. A few minutes later a number of shots were heard coming from the railroad yards by John Garrabrant, a night watchman of various plants in the neighborhood, which were from one to two blocks distant from the freight house. Garrabrant was on his last round, and as he was unlocking the door of the Meyers Furnace Works three men passed him going up Washington street toward the freight house. He went in, made his rounds, came out and went across the street, and just as he stepped

on Cedar street the shooting began. He counted up to five shots. He walked a short distance up Washington street and stood on the corner talking to another watchman, when three men came down the street from the direction of the freight house, one of whom was puffing, Garrabrant testified, "like a quarter-horse." He asked the man who was puffing, "What the devil are you puffing about?" but he turned and ran down May street without answering, while the other two went straight down Washington street. The shots were also heard by Fred J. Faust, a car inspector, who was at Cedar street, three blocks from the freight house, and who said they came so fast he could not count them. A search was made for Wells a little later, and before seven o'clock his body was found in the yards beside a pile of ties. He had been shot in the right arm, the right leg and the chest, the last wound causing his death. The ball entered the body at a point about two and one-half inches below the arm-pit on the right side and passed through the right lung and the blood vessel carrying blood from the heart to the upper part of the body, and out of the body through the sternum.

The Chicago, Burlington and Quincy railroad freight house is located at the corner of Washington and Persimmon streets. On the side of the freight house toward the river there is a loading platform, and next to it are several stub-tracks, on each of which on the night of the homicide a number of freight cars were standing. Among them, on track 1, which is next to the loading platform, was a Rock Island car, No. 34,476, which was placed there about 3:00 or 3:30 o'clock that morning. It was near the end of the freight house toward Pecan street, which is two blocks from Persimmon street. Both doors were closed and the seals intact when the car was checked at 11:00 o'clock that night, but about 6:20 o'clock, while the search for Wells' body was in progress and it was yet dark, the searchers by the aid of a flash-light discovered that the seal on the river side of

the car had been broken and the door was open. No investigation of the interior was made at that time but the door was closed and re-sealed, and on an examination made later it was discovered that many of the packages in the car had been broken open. It was about 300 feet from this car to the place where Wells' body was found. In Wells' pockets were his Colt automatic revolver and his flash-light, both bloody, and his handkerchief was also bloody. In the magazine of his automatic revolver were six unexploded shells, Winchester make, known as .32 automatic cartridges, having metal-cased bullets, the metal case composed of nickel, lead and copper. A bullet of the same kind was removed from the body of the plaintiff in error,—a circumstance which will be referred to hereafter. In the immediate vicinity of car No. 34,476, within a radius of fifteen or twenty feet, twelve exploded .32 automatic cartridges were found, three of which were the kind in Wells' revolver and nine Remington make,—the kind that were afterward found in the pocket of the plaintiff in error's coat. The bullet which killed Wells and went through his body was not found. The surgeon who made the autopsy could not determine whether the hole was made by a .32 or a .38 ball. Either might have made it. Wells' revolver, when fully loaded, carried nine shells. Either the Winchester or Remington make of shells could have been used in his revolver.

The plaintiff in error testified that he was twenty-three years old, unmarried and living with his parents at 1427 Garden street, in Peoria, and on the night of December 2, 1921, was at the Garden Theater with Walter Matthews. Afterward they went to the B. & O. pool-room, and Kircher left there between ten and eleven o'clock for home. About that time someone came to the house and said there was a telephone call waiting for Kircher at 1401 Garden street, where he had been just before going home. He answered the call, had a conversation over the telephone and went

back home. The next morning,—at what hour he did not know,—he went to Cass street and down that street to the railroad tracks. He had been in the automobile business, and he did this in response to the telephone call of the night before which he testified to. He found an automobile on Cass street within fifteen or twenty feet of the railroad track. The call was to go down there and either take the car home or start it. He tried to start the car and found that possibly he could help himself by getting a piece of wire, so he went over to the railroad track and found some wire there. While he was stooping over to pick up the wire and had it in his hands some unknown man shot him. He did not know how many shots were fired. He turned and went up Cass street to Adams street and to Rogers' restaurant. The car he went to repair was a Ford car. It was taken away and he could not trace it. He did not know whose it was or who called him. He did not know what time it was when he went down to where the car was, but it was dark and he did not have a flash-light there.

The evidence of the plaintiff in error's connection with the homicide is altogether circumstantial, except certain statements which witnesses testified upon the trial he had made. About 5:30 in the morning the plaintiff in error came to the restaurant of Warren Rogers, on South Adams street, seven or eight blocks from the freight house, and asked for a bed, saying he was shot and wanted a doctor. The employee there went up-stairs to call another employee to help, and Kircher followed him up and dropped down on the bed which the employee got out of. A physician was called on the telephone. Dr. Maurer arrived a few minutes before six o'clock and Kircher was removed to the St. Francis Hospital. He was found to be very seriously wounded. Dr. Whitten arrived there about seven o'clock in the morning. He dressed his wounds, sent him to the X-ray room and ordered an injection of a fourth of a grain of morphine. The doctor accompanied him and he reached

the ward about half-past eight.  Kircher was suffering and his physical condition at that time was extremely bad, both because of the shock and the loss of blood.  There was a mental depression due to the same reasons, and some sluggishness due to the administration of morphine.  The doctor did not remain long but came back about eleven o'clock. He met the prosecuting attorney, the coroner and the chief of police coming out of the hospital and he went directly to Kircher's bed in the hospital.  He testified that Kircher's condition and mentality at that time were much worse than at eight o'clock.  Physically it was so bad that the doctor feared he was going to die and called the chief of police to tell him so.  His mental condition was also much worse, and the doctor did not think he could live more than two or three hours.  The doctor testified that the morphine given under his direction was given at about 7:30 o'clock, but the hospital chart did not show it.  It did show a fourth of a grain given at 6:30 and an eighth of a grain at 2:30.

The chief of police came to see Kircher in the morning between eight and nine o'clock.  Kircher was asleep or under the influence of an opiate and he did not talk with him. He came back about eleven o'clock and woke Kircher up and had some conversation with him, and about 1:30 o'clock returned again and questioned him in regard to the occurrence of the night before, and in answer to questions he gave an account of his connection with the homicide.  On the second visit the chief of police was accompanied by the coroner and the State's attorney, and on the third visit by the State's attorney and Oscar L. Mayberry, a special agent for the Chicago, Burlington and Quincy Railroad Company.  No stenographer was present, and those present, with the exception of the State's attorney, who did not testify, related on the witness stand the substance of the statements which they testified were made by the plaintiff in error in the conversations occurring at these interviews. Their testimony was, that in response to questions asked by

the chief of police and the State's attorney the plaintiff in error said that someone had told him that he could get some "S" wrenches out of a tool-house in the Chicago, Burlington and Quincy railroad yards; that he had been working on an automobile and he thought he would go down there and get some "S" wrenches; that he went down there for that purpose, and had gone to one of the freight cars and was getting a brake-shoe key out of the car when he heard someone walking up. He turned around and the man started firing at him and hit him three times. He then began to fire at the man and thought he fired three or four times. He went up Cedar street and met a man who asked him what he was puffing about, and from there he went to the restaurant; that he was alone in the freight yards and had a .32 automatic revolver, which he had thrown away in the railroad yards. The testimony of the witnesses was substantially the same, except that Mayberry testified that the plaintiff in error said that he got down by a car to take a brake-shoe key from the car to open a box when he heard a noise and rose up and was face to face with Fred, using that name; that Fred began shooting and had shot him three times when he went down on his knees; that he got up on his hands and knees and began to shoot at Fred, when he heard him say "Oh!" and knew that he had hit him; that Fred had emptied his gun and was re-loading when he shot at Fred. The plaintiff in error testified that he did not know Wells. He received but one wound. All of the witnesses thought the plaintiff in error conscious and rational. They could not remember the exact questions asked or words used in the conversations. The plaintiff in error testified that he remembered nothing of these conversations,—in fact, that he remembered nothing that occurred at the hospital for three or four days after he was given the dose of morphine. Dr. Whitten testified that the effect of morphine varies with the individual; that the effect of a quarter of a grain would last from one hour to

half a day; that on his second visit he did not think the plaintiff in error entirely rational because of the way he thrashed about in bed, "our inability to control him and the way he talked and muttered," which might have been from pain and might have been from the impending nearness of death; that "he was lying there and muttering sounds that absolutely had no meaning," and that might have been the result of pain; that some of the sounds were groans. This visit of the doctor was just after the first statement had been made by the plaintiff in error.

The plaintiff in error objected to the admission of these statements unless preliminary proof of their voluntary character was made. The court offered to permit cross-examination of the witnesses by the plaintiff in error's counsel if he had any question about the voluntary character of the statements, but counsel declined, saying: "I am making the objection; it isn't up to me to make the preliminary proof." Thereupon an examination of the witnesses in regard to the conversations was permitted to proceed. The admissibility of this testimony is the principal question in the case. Counsel have devoted the greater part of their brief and argument to its discussion, treating the statements as if they were confessions. They were not confessions. A confession is a voluntary admission or declaration by a person of his agency or participation in a crime. It is an acknowledgment of guilt and not of incriminating facts. (*Johnson* v. *People,* 197 Ill. 48; *Michaels* v. *People,* 208 id. 603; I Greenleaf on Evidence, sec. 170.) An acknowledgment of facts merely tending to establish guilt is not a confession but only an incriminating admission, which may be made without any intention to confess guilt. Thus, the acknowledgment of the incriminating facts stated was held in each of the following cases not to amount to a confession: The admission of a person charged with murder that he had in his possession certain property of the murdered person; (*State* v. *Red,* 53 Iowa, 69;) the declaration of

one charged with arson explaining his possession of some of the goods which were in the burned building and his knowledge of the whereabouts and possession of other of the goods; (*Fletcher* v. *State,* 90 Ga. 468;) the statement of a defendant that he was present when a homicide was committed but took no part in it and did not know that it was intended until after it had occurred; (*Boston* v. *State,* 94 Ga. 590;) the admission of a defendant charged with forgery that he wrote the name of another person to a note. (*State* v. *Knowles,* 48 Iowa, 598.) In the last case the court said: "A confession implies that the matter confessed is a crime." The prisoner may have intended by his admission to imply that the act was done rightfully. Even a confession made under the circumstances shown by the evidence would have been admissible in evidence and the circumstances shown could have gone only to its weight. It is not necessary to the admissibility of a confession by a defendant that he should have been warned that what he said would be used against him, that it was elicited by questions even though they assumed the defendant's guilt, or that it was procured by deception. (1 Greenleaf on Evidence, sec. 229.) Though a confession must have been voluntarily made,—that is, without the influence of hope or fear exerted by persons having authority,—it is not necessary that it should have been the defendant's spontaneous act. The fact that the confession was made while the person making it was intoxicated goes to the credit to be given to the confession and not to its weight. (*Eskeridge* v. *State,* 25 Ala. 30; *Commonwealth* v. *Howe,* 9 Gray, 110; *State* v. *Feltes,* 51 Iowa, 495.) The question of admissibility is, finally, whether, considering all the circumstances in the particular case, they were such that the statement of the plaintiff in error might have been induced by their influence to make a false confession. (*People* v. *Klyczek,* 307 Ill. 150.) There is nothing to raise such a presumption in this case. The statements of the plaintiff in error were

all exculpatory. The damaging fact was admitted that the plaintiff in error was at about the place where the homicide occurred about the time it occurred and was then and there engaged in a shooting fray, but this fact was accompanied with statements showing that he was not the aggressor or in fault. The court did not err in admitting this testimony.

The physical and mental condition of the plaintiff in error by reason of his injuries and the medicine which had been administered to him, his weakness and the apparent near approach of death, were proper for the consideration of the jury in determining the weight which should be given the statements. The discrepancy in the testimony as to statements made was also to be considered by the jury for the same purpose.

When the plaintiff in error arrived at the hospital he was wearing a navy pea-jacket in which was a bullet hole corresponding to the wound in his body. In the pocket of this coat were four loaded shells known as .32 automatic cartridges made by the Remington Arms Company, the bullets with exposed points of lead. These shells, together with the empty shells found in the yards, were received in evidence over the objection of the plaintiff in error. It was objected that these cartridges were not admissible because it was not shown that the deceased was killed by a .32-caliber revolver. The bullet was not found, but it was shown that the wound in Wells' body might have been made by either a .32 or a .38-caliber revolver, and it was competent to introduce evidence that the defendant had cartridges of either caliber in his possession.

The bullet which has been mentioned as having been removed from the plaintiff in error's body entered his chest in front, penetrated the soft tissue of the lungs and was removed from the muscles of the back, where it was lodged. It encountered no hard substance in its passage through the body. The bullet which killed Wells and that which wounded the plaintiff in error were practically alike and

had the same power of penetration, but the former went through not only soft tissue but also bone and passed out of the body. It is therefore argued that the plaintiff in error could not have fired the shot which killed Wells because shots of the same power fired at one another from the same distance would not have differed so greatly in their penetration, from which the conclusion is drawn, consistent with the plaintiff in error's testimony, that he was several blocks away from the affray and was struck by a bullet partially spent. This conclusion does not follow, because it does not take into consideration all the conditions, and cannot do so because some of them are unknown. The bullet which wounded the plaintiff in error may have struck some other object first, from which it glanced or rebounded and struck the plaintiff in error. In fact, several bullets were picked up close to the rails, a few feet from the place where the shells were found.

Objection was made to the introduction of evidence tending to show the burglary of the box-car, on the ground that there was no evidence tending to show that the plaintiff in error had anything to do with the burglary. It was the duty of the deceased to protect the cars in the yards from burglary. He was there for that purpose. The broken seal and open door of the car, the broken packages of goods in the car, the fusillade of shots in that neighborhood, the empty shells on the ground, the dead body of the officer a few yards away, tend to prove that an attempted burglary was interrupted by the officer and that shots were exchanged by the burglar or burglars and the officer. The admissions of the plaintiff in error tend to show that he was present at the time, and no reasonable explanation appears of his presence except for the purpose of burglary. The evidence as to the burglary was properly admitted.

It is argued that the evidence did not sustain the verdict. The circumstantial evidence all points to the truth of

the statements of the plaintiff in error at the hospital that he was present at the time this murder was committed. His explanation of his presence cannot be accepted by any reasonable person. That he should go down to the railroad at five o'clock of a December morning in answer to a telephone call made the night before by a stranger to repair or start an automobile whose owner he did not know, and after finding the car and discovering that he needed a piece of wire in his work should go over on the railroad track, fifteen or twenty feet away, in the dark, to find a wire without any light, and should there find the wire, and while he was stooping down to pick it up should be assaulted with a revolver, surpasses credulity. The jury could not have believed such a story or rendered a verdict other than guilty.

The judgment is affirmed.                    *Judgment affirmed.*

---

(No. 15337.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROLLIE BERRY, Plaintiff in Error.

*Opinion filed October 20, 1923.*