(No. 30372.
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HERMAN A. MANSKE, Plaintiff in Error.

*Opinion filed January 22, 1948.*

GLENN K. SEIDENFELD, of Waukegan, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, of Springfield, and HARRY A. HALL, State's Attorney, of Waukegan, (DANIEL J. DALZIEL, of Waukegan, of counsel,) for the People.

Mr. JUSTICE GUNN delivered the opinion of the court:

The plaintiff in error, Herman A. Manske, hereafter referred to as defendant, was indicted by the grand jury of Lake County for manslaughter. The indictment contains four counts. The first count charged that on January 28, 1947, the defendant assaulted Emma Jeska with his fist, striking her a violent blow in and about her face, mouth, chin or jaw, knocking her down with great force and violence upon the floor, against the wall, or some other object unknown, causing her to strike her head with force and violence, whereby her skull was fractured, giving her a fatal and mortal wound, from which she died January 31, 1947. The second count is substantially the same, except the injury and death were caused in some manner to the grand jurors unknown. The third count is the same as the first count, except the charge is that the defendant struck the deceased with a bottle. The fourth count charged the defendant made an assault upon Emma Jeska with a certain bottle, with intent to inflict great bodily injury, when all of the circumstances showed an abandoned and malignant heart. The defendant waived trial by jury, and the trial was had by the court. After the evidence was concluded, the court, without hearing any argument, said: "I am going to find this man guilty of manslaughter." A motion for a new trial and a motion in arrest of judgment were both denied by the court, which

thereupon sentenced the defendant to the penitentiary for a minimum of five years and a maximum of fourteen years. From this action of the trial court the defendant prosecutes his writ of error.

The evidence discloses that Emma Jeska, a woman about fifty years of age, was found dead upon the morning of February 1, 1947, lying in a bed in a three-room cottage in the country part of Lake County, in which she had been living with the defendant. The body was on its back with blood dried on the right cheek and blood matted into her hair over the right ear. The right side of the face was flattened, as though the head had laid on a flat surface, and blood had formed and dried matting the hair. There was no blood or stains of blood on the bed linen, and none was found elsewhere in the house, or upon any object in the house. Upon the body there was an abrasion on the nose approximately three-fourths of an inch long and one-half inch wide, and the skin had started to heal before death. There was a bruise upon the right temple, on one finger of the left hand, and on both knees. An autopsy performed that evening disclosed a large subdural hemorrhage on the left side, causing a depression in the frontal lobe of the brain. It also disclosed a fracture of the inner plate of the skull in the right occipital area, and a fracture of the bone which separates the nose from the skull cavity.

The physician performing the autopsy testified that whatever caused the injury to the right side of the head could cause the fracture, and as a result of the fracture the transmitted force through the skull cavity could have caused the hemorrhage on the other side of the brain. The physician also testified that the death was actually produced by the subdural hemorrhage, and that the subdural hemorrhage was caused by whatever produced the fracture.

The autopsy also disclosed there was no food in the stomach, the small intestines were empty, and very little matter in the large intestine. It also disclosed that the

skin was clear; the muscles were normal in appearance; the lungs were normal; there was no evidence of hemorrhage or other pathological findings in the lungs; the heart was also essentially normal, the valves were normal, the muscles were of good color, and showed no evidence of old or recent damage. There was no abdominal fluid or hemorrhage of the abdominal cavity; the stomach was in its normal position, as were also the intestines, and the bladder was empty. The spleen was removed and found to be normal; the liver and kidneys were normal; and the cause of death was basal skull fracture in the right occipital area, multiple bruises and abrasions, subdural hemorrhage in the left frontal lobe of the cerebrum. The physician did not make a microscopic examination of the organs of the body.

At the time of the autopsy there was no *rigor mortis* in the body. The physician stated the hemorrhage which caused death could not form in less than eight or ten hours, nor more than twenty-four to forty-eight hours prior to death. He further testified that *rigor mortis* starts in about eight to twelve hours, and remains in the body from two to four days, depending upon the circumstances. Heat will usually slow up the process, and cold will add to it more quickly. He gave it as his opinion that the deceased had been in fair health previous to death, and that in his opinion she had been dead about forty-eight hours at the time of his examination.

At the time the body was found the fire in the house was out and water in the kitchen had frozen. The defendant was about sixty years old, and had been employed as a bartender in a local club for more than a year. The defendant and the deceased had purchased the property several months before the death, and had been living together, although defendant was married and had a wife and family he was supporting. Defendant worked at the club where he was employed, from three P.M. until mid-

night, with the exception of Friday and Saturday, when he worked until one A.M. He had every Monday as his day off. During the week preceding the finding of the body the defendant had not worked on Monday, but came to work on Tuesday, and on Tuesday night and Wednesday night he stayed at the club because of a severe snow storm, but as to Thursday there is some conflict as to whether he stayed at the club or went to his home. He returned to the club about 3 P.M. Friday and worked until the club closed. He did not go home Friday night, but slept at the club, and shortly after 7 A.M. Saturday went to his house. He returned to the club about 9 A.M., and at the time was excited and in tears, and told the porter that he had to knock the door down and found Emma dead and lying on the floor, and asked that a funeral director be called, and to notify Mrs. Jeska's son. The funeral home informed the porter it would be necessary to call the sheriff's office, and when informed of this defendant requested that the sheriff stop by the club and pick him up, so he could accompany him to the house. He went with the deputies, and was taken into custody when they discovered the condition of the deceased. The evidence shows the defendant at the time was highly nervous, and made various statements that he supposed they would attempt to "pin this on me."

After the defendant was taken into custody he made three statements. One was taken on the day the body was found; the second was taken four days later; and the third consisted of his testimony at the coroner's inquest a week later. The first two statements were given to the State's Attorney, and were taken down by the court reporter. All three statements are somewhat conflicting, but in the main agree upon the essential details. He says he came home Tuesday morning about four o'clock, after his day off, and that at that time the deceased called him vile names and he hit her and knocked her down on the daven-

port, and when she got up he struck her again. The vile statements were applied not only to himself but to his wife and daughters. He is not definite in this statement as to what he used to strike the deceased. He also stated that on Friday morning he had another argument, and that she again applied the vile names, which resulted in him hitting her with his open fist, and backing her up against a table, when she complained he was hurting her back, and he let her go, and she went to bed. In his statement before the coroner's jury he said the last time he saw the deceased alive was on Friday morning.

Defendant testified in his own behalf upon the trial, and said that on Monday he had asked the deceased to go to town with him so they might file their income tax return, but that she was drinking and would not go; that he had several drinks in a tavern on that day, and returned on Tuesday, when the deceased, who had been drinking, argued with him, calling him vile names, when he slapped her in the face and on the mouth, and when she came back for more he pushed her on the davenport; that he came home on Thursday morning and got a clean shirt, and that the deceased was in good condition, and ironed the shirt for him, and that on Friday morning, when he told her he had been sending money to his daughter for her support, that she called his daughter obscene names, and that he hit her on the side of the face, and pushed her against the table.

In addition to this evidence the defendant introduced testimony of three witnesses to the effect he had a good reputation as a peaceable and quiet citizen, and there is in the record testimony that the deceased had been sick for some time, and that it was difficult for her to walk by herself, and that she drank excessively. At the close of this testimony the court, without hearing argument from either side, announced he was going to find the defendant guilty of manslaughter, and that he would hear arguments

as to the punishment to be inflicted. Counsel for the defendant protested he desired to argue the evidence, but he was interrupted by the court announcing that he did not care to hear further argument on the evidence.

The defendant contends the conviction cannot be sustained principally for three reasons: First, the *corpus delicti* was not established beyond a reasonable doubt; second, that it was not proved beyond a reasonable doubt that defendant caused the death of deceased; and, third, that the court committed reversible error in depriving the defendant of a fair and impartial trial by refusing to hear arguments on the evidence.

The argument of counsel centers principally upon whether the *corpus delicti* was proved in the case. The rule as to what constitutes the *corpus delicti* has been announced many times. In a trial for murder it consists of two parts or essential elements,—the fact of death, and the fact that death was produced by the criminal agency of some person. (*People* v. *Bentley,* 357 Ill. 82; *People* v. *Hanson,* 359 Ill. 266.) Both of these elements must be established beyond a reasonable doubt. (*Campbell* v. *People,* 159 Ill. 9; *Hoch* v. *People,* 219 Ill. 265; *People* v. *Ahrling,* 279 Ill. 70.) The *corpus delicti* consisting as it does of proof of death and of a criminal agency does not in itself include the person who committed the crime, although it is one of the elements necessary to be proved beyond a reasonable doubt to convict the defendant. The question raised here, however, is whether or not the *corpus delicti,* consisting of the two elements of death and criminal means, has been established.

The fact that the dead body of Emma Jeska was found is admitted to be true, so that the other element on which proof must be made to establish the *corpus delicti* was that of the criminal agency. The facts established on this second element were that deceased had two fractures of the skull, one to the right rear, and the other where the

nasal bone joins the cavity of the skull under the frontal bone., The fracture to the right rear resulted in a subdural hemorrhage which was the direct and producing cause of death. There were contusions upon the face, hands and knees of the deceased, established beyond any question. The proof shows every other vital organ of the deceased was normal, and that the door of the building was locked from the inside when her body was found, excluding the hypothesis that some other person had been within the building. And besides, there is the direct testimony of the defendant upon the witness stand that he struck the deceased on two different occasions, both times knocking her down upon the floor or upon the davenport, and also of pushing and shoving her against a table. In addition to this the testimony of the doctor is that the wounds and injuries inside of the skull were sufficient to cause death, and that the blow from the outside would and could have caused the right rear fracture.

It is contended, however, that the *corpus delicti* cannot be established by the statements of the defendant. This is not an accurate statement of the law. The well-settled rule is laid down in *Campbell* v. *People,* 159 Ill. 9, as follows: "It is, however, familiar law,. and frequently recognized by this court, that extra-judicial confessions of the commission of crime, where such confessions are relied upon to establish guilt, are not sufficient to authorize a judgment of conviction without other sufficient proof of the *corpus delicti,* but that the *corpus delicti* should first be otherwise established, not, however, necessarily by direct evidence only. [Citations.]" This case has been cited and followed a great number of times and is settled law upon the subject. The point to be noticed, however, is that the *corpus delicti,* that is, the death and the criminal agency, cannot be established by the extra-judicial confession· of the defendant. A confession is an acknowledgment of guilt, and not of any particular fact connected with the

case, and the rule was doubtless adopted because in the past instances had occurred where defendants, under promises or threats, confessed to the murder of missing persons, who, in fact, were afterwards found to be living.

It is to be noted also that the rule as laid down refers to extra-judicial confessions, which, of course, are confessions made outside of a hearing before a magistrate or court. A judicial confession consists of a plea of guilty to an indictment, or some similar action in a court or judicial proceeding. There is a well-defined distinction, however, between a confession and an admission. In *People* v. *Gibbs,* 349 Ill. 83, (a homicide case,) it was said: "The statements made by him were exculpatory admissions and did not amount to a confession of guilt. They amounted to a claim of self-defense. An acknowledgment of facts which may tend to establish guilt is not a confession but only an incriminating admission, which may be made without any intention of confessing guilt. The statements being exculpatory, preliminary proof of their voluntary character was unnecessary."

In *People* v. *Kircher,* 309 Ill. 500, (a homicide case,) certain statements had been taken from the defendant, and in the trial of the cause offered in evidence. The objection was made that there was no proof of their having been voluntarily made, which was overruled. In passing upon this alleged error the court said: "Counsel have devoted the greater part of their brief and argument to its discussion, treating the statements as if they were confessions. They were not confessions. A confession is a voluntary admission or declaration by a person of his agency or participation in a crime. It is an acknowledgment of guilt and not of incriminating facts. [Citations.] An acknowledgement of facts merely tending to establish guilt is not a confession but only an incriminating admission, which may be made without any intention to confess guilt." In the *Kircher case* a number of citations from

other States are made to illustrate the rule. *People* v. *Okopske,* 321 Ill. 32, (a murder case,) follows the *Kircher* case.

The direct testimony of the defendant in this case while a witness in his own behalf, and not as a confession, established facts which are material to the proof of the second element of the *corpus delicti.* This testimony upon the witness stand, given for the purpose of disclosing facts excusing himself certainly cannot be considered an extrajudicial confession. It is, however, proof of facts going to establish the *corpus delicti.* In this case, therefore, by competent evidence, the death of Emma Jeska is established, together with the other facts proving an illegal agency causing such death.

The question next presented to the court is whether the defendant, Manske, was the person who put into motion the criminal agency which caused the death of the deceased. There is no doubt from his own testimony that he assaulted the deceased upon two different occasions within forty-eight hours of each other. The assault was heavy enough so that in both instances she was either knocked to the floor or against or upon some furniture. The assaults were unjustified, not in self-defense, and were illegal. While there is some testimony of a witness that the deceased was of a sickly nature, the evidence of the doctor shows all of her vital organs were in normal condition for a woman of her age. And there was a further circumstance, from the absence of blood from the bed linen, that the evidence of the assault had been cleaned or washed from the floor of the room, and the defendant admits he took her from the floor Saturday morning and placed her in bed. The locked door, at least presumptively, excluded the presence of any other person in the house during the absence of the defendant.

The question of whether such proof establishes the guilt of the defendant beyond a reasonable doubt is a

question for the jury. A crime had been committed. Does the evidence show that the defendant was the author of the crime? It is claimed there are no cases in the books which justify the conviction of the defendant under circumstances such as are disclosed in this record. In *People v. Hartwell*, 341 Ill. 155, the defendant was charged with murdering a woman by beating her to death, and the point was raised that he had not been proved guilty beyond a reasonable doubt. There were bruises upon her body which were sufficient to cause death, and she was found upon the floor of the bedroom of the defendant, in a helpless condition. In discussing this proof the court held that all of these circumstances and controverted questions of fact were submitted to the jury, and that they were sufficient to justify the affirmance of the case.

In *People v. Sink*, 374 Ill. 480, the question involved was whether the striking and beating of the deceased with their fists by the defendants were the cause of death. The defense claimed the cause of death was an injury he had received in an automobile accident some days before. The evidence disclosed that while the deceased did not have a fractured skull there was an internal hemorrhage of the brain which the physicians testified could have been caused by the blows inflicted, and which produced death. The defendants offered evidence to the contrary, but, in affirming the conviction, we said: "It was the jury's province to consider all the circumstances bearing upon the cause of death and, in the light of these, determine the weight to be accorded to the testimony of the several medical experts. There is sufficient evidence to sustain the verdict and in such a situation this court will not substitute its judgment for that of the jury. [Citations.]"

We are of the opinion, therefore, that, upon the main issue raised by the plaintiff in error, the *corpus delicti* was established beyond a reasonable doubt by direct testimony, and not by any confession upon the part of the defendant.

We are of the opinion also that there was evidence as to who was the author of the blows which caused the death, sufficient to establish beyond a reasonable doubt that they were inflicted by the plaintiff in error. The finding of the judge based upon the evidence in this regard, under such circumstances, will not be disturbed.

It is also claimed that the trial court committed reversible error in declining to hear argument after the evidence was concluded. As a general rule, in a trial by the court without a jury, we are of the opinion that it is advisable in most instances for the court to listen to argument of counsel, even though it does not appear to be helpful to the court. The testimony was all taken in the presence of the trial judge; he had the opportunity to see and to hear the witnesses, and to observe the attitude and manner of testimony of the defendant. He could observe wherein he was contradicting his statements in court with those made to the officers, and could more properly judge the weight to be given the same than could we. It was perfectly natural for defendant, after the body of the deceased was discovered, and the evidence of the bruises found upon her body, to soften as much as possible the description of the assaults, which he admits were committed.

We are of the opinion that the argument of counsel in this particular case would not have aided the court very much. The same point was made in *People* v. *Berger,* 284 Ill. 47, and there the distinction was made between arguments before a court without a jury and before a jury, and it was held argument to a jury was a matter of right, but argument before a court, alone, was largely a matter of sound discretion of the trial judge. In this particular case the court believed the evidence sufficient to convict the defendant of manslaughter, and after so announcing told his counsel he would be heard upon the question of punishment, but declined to hear any argument upon the guilt of the defendant.

We are thoroughly satisfied of the guilt of the defendant beyond a reasonable doubt, and do not believe that the defendant was prejudiced in any way by the court declining to hear argument upon the merits of the cause.

The judgment of the circuit court of Lake County is affirmed.

*Judgment affirmed.*