People of the State of Illinois, Plaintiff-Appellee, v. Carl
Yocum, Defendant-Appellant.

Gen. No. 69–144.

Second District.

April 9, 1970.

John T. Beynon, Public Defender, of Rockford, for appellant.

Philip G. Reinhard, State's Attorney, of Rockford, and William R. Beu, Assistant State's Attorney, for appellee.

MR. JUSTICE SEIDENFELD delivered the opinion of the court.

Defendant, Carl Yocum, appeals from a judgment of conviction and sentence of 3 to 10 years after a jury verdict finding him guilty of Involuntary Manslaughter.[1]

He claims deprivation of a fair trial because of newspaper publicity, and also urges that he was not proven guilty beyond a reasonable doubt.

On October 7th, 1968, three-week-old Carol Yocum died.

Dr. Joseph Hosek, a pathologist, testified to the results of his autopsy examination performed on October 7th, approximately one-half hour after the child's death. On external examination of the body he found black and blue marks on the buttocks, measuring about two and one-half inches at greatest length. On examination of the infant's head he found a subarachnoid hemorrhage and also a subdural hemorrhage. In this area, which was over the occipital and parietal lobes of the left cerebrum hemisphere, the brain was very soft; and the remaining part of the brain was swollen because of the increase in pressure caused by the hemorrhage. There were no external marks on the head in the area of the damage.

The Doctor concluded that the cause of death was the pressure of the hemorrhage on the brain. His further opinion was that "this type of hemorrhage is usually the result of a head injury."

---

[1] Ill Rev Stats 1967, c 38, § 9–3.

"A person who kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly."

Ill Rev Stats 1967, c 38, § 4–6. Recklessness.

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. . . ."

He ruled out birth injury because the hemorrhage "looked like it was a week old," plus or minus a couple of days. He said the symptoms of the injury might "take a while" to appear. On examination of the thymus he found nothing wrong.

On cross-examination, the Doctor alluded to reports in the literature and textbooks that spontaneous subdural hemorrhages can occur as a result of a bleeding tendency or infection, and said "so one cannot be absolutely certain, but still this type of hemorrhage is usually related to head injury." The Doctor ruled out other causes because there was no history of any bleeding tendency or finding of infection.

The Doctor also testified that the cause of the injury would not necessarily have been a blow to the head itself; that there were reported cases of forces originating at the buttocks and feet which could be transmitted to the brain. He could not say which force caused the particular injury but testified that it was due to trauma. The Doctor's final conclusion of the cause of death was that "I would have to say it was caused," by a head injury.

The baby's mother, Mary Ann Yocum, testified that there was nothing wrong with the child at birth. Both she and defendant tried to stop the baby from crying on September 30th, 1968. She said,

> "Well, Carl had taken the baby into the bedroom, and was going to put her into the bed. And then he went out and she was crying, and I picked her up and she kept crying, and he walked into the bedroom and he went and dropped her on the bed and she bounced up and hit her head on the headboard."

. . . . . .

Q. "Was he angry at that time?"

A. "Well, he was upset, he wasn't mad."

129

The mother further testified that it was the left side of the baby's head which hit the headboard; and following this she noticed a little red mark on the child's head over the left ear, but this was gone the following day. She referred to black and blue marks on the baby's buttocks, and related a conversation with defendant in which she said to him that he "shouldn't have hit her, that he was going to hurt her"; and to her husband's answer that "he knew he shouldn't have done it and didn't know why he did it."

Mrs. Yocum related that they took Carol to the Doctor on October 2nd for treatment of a cough, at a neighbor's suggestion. The Doctor examined the baby and sent her home without prescribing medicine. It was the next day she found the black and blue marks on the baby's buttocks. That night the child choked on the bottle and stopped breathing for a couple of seconds and turned black and blue. They called a rescue squad and the baby seemed all right. The child appeared white that night and didn't cry or wait for her bottle, so they took her to the hospital the next morning which was Friday, October 4th, where she remained until her death on October 7th.

The mother also testified to an incident on September 29th when defendant held the baby out from him and dropped her on the seat of their car because of the child's crying.

On cross-examination, Mrs. Yocum admitted that she had stated to defendant's counsel prior to trial that her husband didn't "intentionally" hurt the baby and that when he dropped the baby on the bed it was an "accident." However, on redirect examination she testified,

"No, it wasn't an accident, he just dropped her,"

and repeated on recross:

"It wasn't an accident when he dropped her on the bed."

130

Mrs. Yocum's sister, Alice Law, who was living with the Yocums at the time in question, testified to events of September 25th and shortly after midnight, on September 26th. She said the baby was crying and the defendant brought the baby into the bedroom while she remained in the other room. She heard the sound of the bed squeaking and heard defendant "cussing the baby" just before that. She also testified to hearing the sounds of the baby being spanked several times and to hearing the baby scream.

Other witnesses testified to defendant's use of profane language toward the baby on September 24th and 25th when they heard the baby crying. These were neighbors who confirmed hearing the sounds of the baby being slapped and her scream. A brother-in-law of defendant was permitted to testify to a conversation with defendant in July of 1968 in which Yocum was alleged to have said, prior to the birth of the baby, that it was not his, and that his wife had told him that it wasn't his.

The State called Dr. McIntosh, who had seen the baby on October 2nd and October 4th. He testified that on October 2nd he saw the baby in his office and that the defendant and his wife told him that she had a cold. He made a general physical examination and did not observe any marks on the baby and concluded that she was healthy and normal at that time and that there was no evidence of a cold. He saw the child two days later at the hospital and said that the baby was quite ill at that time. She appeared to be having spasms, generalized convulsions and was having difficulty breathing. He said he asked the defendant and his wife what they thought had happened to the child and the defendant said that the night before the baby seemed to choke on feeding, and since then hadn't eaten and seemed to be lethargic. He asked if there could be any injury to the baby and they said they didn't know of any. He noted bruises on the buttocks at that time which he did not recall seeing two

131

days before, on October 2nd. Defendant or the mother said that the baby had bumped the side of the crib.

The State also called Dr. Fouts, who saw the baby at the hospital on October 3rd in the emergency room. He noted a history that the child had choked on milk after someone had been swinging the baby, but he found nothing unusual on his examination and concluded that the baby had gotten something in her throat and "dry choked" as babies often do. He advised the parents to see Dr. McIntosh, their family doctor, if there was more trouble.

Carl Yocum testified in his own behalf. He denied the conversation with his brother-in-law, but confirmed that he had been told by his wife that the child was not his. With reference to the date of September 25th, he could not recall spanking the child or swearing at her and could not recall swearing at the child at any time. He said that on September 28th he did not swear at Carol Ann or spank her.

He related that on September 30th the baby was crying and he took her in his arms; the alarm clock radio on the headboard of the bed came on and it was such a blare that he went to shut it off and in leaning over, the child gave a little tug with her feet and she rolled off his arm. He tried to catch her but avoided falling on top of her. He then picked her up and said he was sorry it had happened.

At a further stage in his testimony, defendant admitted that on occasion he had patted the baby on the bottom but that it was not sufficient to cause a bruise and that he was not angry when he did it.

On cross-examination, he admitted that he did not tell the Doctors at the hospital about the baby being dropped and her hitting her head on the bed.

Defendant's claim that he was not proven guilty beyond a reasonable doubt is substantially premised on his argument that the State did not prove that a criminal act

132

was committed by defendant which was the cause of the death.

■ The indictment charged defendant, in the language of the statute, with Involuntary Manslaughter "in that he, while acting in a reckless manner, performed acts which were likely to cause death or great bodily harm to Carol Ann Yocum, in that he struck, beat, dropped, threw and killed said Carol Ann Yocum without lawful justification." The evidence was sufficient to support the jury's verdict.

The only eyewitnesses to the acts of defendant on September 30th were the child's mother and the defendant. The mother testified that defendant, after unsuccessfully trying to stop the child from crying, dropped the three-week-old infant with sufficient force to cause her to bounce off the bed and strike the headboard. While the mother at one stage in her testimony used a conclusion that "it was an accident," it is clear from all of her testimony that she was saying that the dropping was deliberate although she believed defendant did not intend its consequences. The exculpatory version by defendant of the incident made an issue for the jury's determination of credibility.

In addition to the defendant's acts on September 30th, there was other evidence of trauma resulting from defendant's conduct toward the child. The mother testified to spankings which were sufficient to cause substantial bruises on the infant's buttocks. And there was circumstantial evidence which contradicted defendant's version of an accidental dropping of the child, including use of profanity toward her on a number of occasions before, and including the September 30th incident. The denial by defendant, again, made an issue for the determination by the jury.

■ Defendant also urges that the testimony of the pathologist was vague and unsatisfactory, particularly in

133

view of the testimony of the Doctors who treated the child prior to her death and found nothing wrong. We cannot agree. Dr. Hosek was clearly of the opinion that the death was caused by a head injury. His response to other possibilities which could be the cause of death was not inconsistent with that opinion, there being no history of congenital defect, bleeding tendencies or infection. Nor was his testimony rendered unsatisfactory by his statement that he could not isolate the particular act which would cause the effect which he found, since either the striking of a child of the age involved on the buttocks if with sufficient force, or the dropping of the child with the force shown by the uncontradicted evidence, could account for the resultant injury.

The statements of Dr. McIntosh and Dr. Fouts were not inconsistent with the finding of the pathologist, since neither was given a history of trauma.

We do not find the evidence so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of defendant's guilt, and therefore cannot disturb the jury's finding of guilt. The People v. Crews, 38 Ill 2d 331, 335, 231 NE2d 451 (1967); People v. Kinzell, 106 Ill App2d 349, 359, 240 NE2d 319 (1969).

Defendant also claims that newspaper publicity during the trial was prejudicial, requiring a reversal.

The trial began on November 25th, 1968. The jury was not segregated, but it is conceded that the jury was admonished not to discuss or read about the case. The Rockford Register Republic, the only local evening newspaper, contained an article the evening of November 25th entitled "Child Abuse, Tough To Detect, Tougher To Predict, Prosecute." There was no reference to the instant case, but there was a review of the subject of child abuse.

On the following day, November 26th, the same paper, in its morning edition, printed another article captioned "Mother Testifies in Homicide Trial." This article was

134

essentially factual except that it referred to defendant's statement to police that he admitted dropping the child on the bed, although the defendant's statement was not introduced until a later day of the trial. It was also stated in the article that Mrs. Yocum agreed with this statement by the defendant but that her further statements were very inconsistent.

Defendant's counsel brought both articles to the attention of the trial judge on November 26th and moved for a mistrial.

The court questioned the entire jury. With the exception of two jurors, all stated they had not seen the articles. One juror said that her husband had pointed out the evening article without further comment, and that she saw only the first part which referred to a child's finger being broken, and read no further. The remaining juror said he read only "the caption of the morning article" and "skipped it all. I had to." The court thereupon denied defendant's motion for a mistrial.

Defendant's new trial motion did not specifically raise the issue of newspaper publicity, but we review the question on the basis of the record.

No authorities have been furnished in defendant's brief or argument to support his position. We have reviewed the findings of a representative number of Illinois cases on the subject and conclude that the court did not abuse its discretion in denying the motion for a mistrial under the circumstances of this case.

The jury was previously admonished not to read about the case. The court undertook to inquire whether there was any violation and was entitled to believe the jurors' answers. While defendant argues that the jurors must have read the articles and presumably responded untruthfully, there is no evidence of any kind to support the bare assertion. The jury was told in several instructions that it was to consider only the evidence in the case, and should not be influenced by anything other than

135

the law and evidence in the case. We find no basis for an inference that the jury was influenced or prejudiced by the articles. The People v. Brinn, 32 Ill2d 232, 238, 204 NE2d 724 (1965); The People v. Hagel, 32 Ill2d 413, 415, 206 NE2d 699 (1965); and The People v. Malmenato, 14 Ill2d 52, 63, 150 NE2d 806 (1958). The article concerning the trial contained no more than information which the jury acquired from the evidence during trial and was not of an inflammatory nature. See The People v. Taylor, 32 Ill2d 165, 170, 171, 204 NE2d 734 (1965); and People v. Robertson, 74 Ill App2d 360, 363, 220 NE2d 5 (1966).

The People v. Murawski, 394 Ill 236, 68 NE2d 272 (1946), is clearly distinguishable. In that case there was no record of questioning by the court, the article was replete with facts which did not and could not come before the jury, and the prejudice was compounded by the reference to terms used only in the article, in the argument of the prosecutor. The People v. Cain, 36 Ill2d 589, 224 NE2d 786 (1967) is also distinguishable on its facts. The headlines there were clearly prejudicial and contained matters which were not properly for the jury's consideration; the court failed to make a fair investigation to determine if the juror was prejudiced; and the court refused an instruction tendered by the defense that the jury should not consider newspaper articles.

██ The publicity during trial did not deprive defendant of his right to a trial before a fair and impartial jury.

On the complete record we find that defendant was properly found guilty beyond a reasonable doubt in a trial free from reversible error, and we, therefore, affirm the judgment.

Affirmed.

ABRAHAMSON and MORAN, JJ., concur.

136