THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
REBECCA J. EVELAND, Defendant-Appellant.

Fourth District   Nos. 15603, 15604 cons.

Opinion filed February 14, 1980.—Rehearing denied March 14, 1980.

TRAPP, J., specially concurring.

Richard J. Wilson and Gary R. Peterson, both of State Appellate Defender's Office, of Springfield, for appellant.

Peter T. Dole, State's Attorney, of Paris, for the People.

Mr. PRESIDING JUSTICE MILLS delivered the opinion of the court:

Rebecca Eveland was convicted at bench of both the involuntary manslaughter of her 2½-year-old son and felony theft.

She was sentenced to 18 months' periodic imprisonment for the homicide and a concurrent 18 months' probation for the theft.

We affirm.

But first the rather extensive testimony.

## FACTS

Donna Curl testified that on the evening of March 29, 1978, defendant and defendant's small son, Michael, accompanied her to Glenda Hess' house. Upon arriving, they left to obtain some beer and later returned. They watched television and played with Michael. Several beers were consumed, but Curl did not know by whom. (Hess later testified that the defendant drank some beer that evening.)

Curl stated that she, the defendant, and Michael left the Hess residence around 10 or 10:30 p.m., and she proceeded to take defendant and Michael home. They stopped at Owen's gas station to buy cigarettes and while Curl was inside the station, the attendant told her that defendant was taking her car. Curl turned around and saw her vehicle being driven off towards Preston Road. Curl testified that she had not given defendant permission to take her car at any time. The car was damaged that evening and subsequently repaired.

Robert Vrinza, Jr., testified that he resided on Preston Road and at approximately 11:15 that evening, he and his wife were driving home when he noticed a compact foreign made car, darkish-gray in color, in a ditch on the east side of Preston Road. Defendant emerged from the vehicle and he asked her if she was hurt and if anyone was with her. She replied that her son was with her but she was incoherent regarding his whereabouts. Vrinza searched for the boy but could not find him.

Deputy Sheriff Thomas Eades stated that he questioned defendant at the scene of the accident. Defendant told him that she had let Michael out of the car because she was going to take her own life and she did not want

her son to get hurt. Eades traveled two-tenths of a mile north from the point where the car had come to a stop and there found Michael's body. At the hospital where the body was taken, Eades heard defendant say, "I killed Michael, put the handcuffs on me, take me to jail."

P. A. Thomas, a member of the Department of Law Enforcement, testified that there was blood on the driver's door of the car. He told of a small clean area about 2½ inches long that he observed on the lower part of the driver's door frame. If the door was closed, the clean area could not be seen.

Several State witnesses, including Thomas, presented evidence to the effect that after defendant let her son out of the car, he was dragged alongside the vehicle. Thomas testified that he observed tire impressions which began near a private driveway and continued several hundred feet to where the car was found in the ditch. Thomas further stated that several scuff marks appeared near the tire prints indicating that "something had been drug."

Jack Eckerty, a special agent for the Department of Law Enforcement, stated that he interviewed the defendant in her hospital room. Defendant admitted taking Curl's automobile and stated, "I don't know why I did it. I just scooted over underneath the wheel and took off."

Agent Eckerty testified that defendant further informed him that as she drove the vehicle south on Preston Road, she decided to commit suicide. She told him that she let her son out of the car near a private residence and told him to walk toward the house. The child started towards the house but turned around, began crying, and proceeded back towards the car with his arms outstretched. She closed the door and drove away because she could not stand to hear the child cry.

Dr. Mario Stefanini, a pathologist, conducted the autopsy on Michael. Three major findings were present at the autopsy. The first was an anteriorial dislocation of the head, which resulted in damage to centers of major bodily functions, and two hemorrhages between the brain and the lining of the brain. Such damage could occur by repeated hitting of the head over a hard surface. Next was a fracture of the boy's right forearm with surrounding hematoma. Such an injury could occur by violently trapping the arm within a strong grip. Finally, there were lacerations, abrasions, and external injuries over the boy's trunk. Such injuries indicated that the boy "was carried along by a moving object while the right buttock and the left shoulder were in contact with a hard surface."

Edgar County Coroner James Honnold testified that following the accident he spoke with the defendant concerning her reasons for letting her son out on Preston Road. Defendant told him that "I let my son out. I

hugged him, let him out of the car and told him to go to the house where the light was on." Defendant then became upset and made the remark, "I killed him. Put the cuffs on me and take me away."

(At the close of the State's evidence, defendant moved to dismiss the involuntary manslaughter charge because the evidence indicated that the child's death was caused by a motor vehicle and under section 9—3(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—3(a)) the offense committed would be reckless homicide. Defendant also made a motion for directed verdict, arguing that the evidence did not show a conscious disregard of the substantial and unjustifiable risk as required for involuntary manslaughter. Both motions were denied.)

Defendant's husband, Charles Eveland, testified that he disapproved of her drinking because "she didn't act just right" when she drank. He said that she would become argumentative after drinking several beers. One evening after a wedding reception that he and defendant had attended, he found his wife lying face up on the ground with her hands crossed over her chest. Defendant could not explain what she was doing. He stated that on that occasion she was drinking only beer.

Another time, Mr. Eveland remembered his wife putting her fist through a glass window. When he subsequently questioned her about the event, she could not recall the incident. He concluded his testimony by saying that the amount of alcohol necessary to trigger these reactions varied and that defendant did not always act in an irrational manner when she consumed alcoholic beverages.

The defendant testified that on one occasion Curl had let her drive the Toyota when Curl was in the car with her. She stated that she knew she had one beer at the Hess residence but might have had two. She could not recall any of the subsequent events until she woke up in the hospital.

Dr. Arthur Traugott, a psychiatrist, examined defendant on May 15, 1978, and again on September 22, 1978. An EEG revealed no present evidence of a seizure disorder. Based on a hypothetical containing facts similar to those in this case, it was Dr. Traugott's opinion that the person described in the hypothetical would have been suffering from "an acute, organic brain syndrome secondary to the ingestion of alcohol." Such a condition could impair one's capacity to conform his or her behavior to the requirements of the law. He stated that the condition manifested itself in confusion, impairment of judgment and memory, and distortion of rational processes.

Dr. Daniel Pugh, a psychiatrist, examined defendant on May 26, 1978. Based on the same hypothetical, he was of the opinion that the person described lacked "substantial capacity to appreciate what she was doing or to conform her conduct to the law."

Dr. Robert Talbert, a psychiatrist, was called by the State as a

rebuttal witness. He had interviewed the defendant on March 31, 1978, and stated that based on his observations of defendant he did not "see any memory deficit."

Also testifying in rebuttal was Dr. Theodore Kiersch, a psychiatrist, who examined defendant on June 9, 1978, and determined that she was competent to stand trial. Based on the same hypothetical, Dr. Kiersch was of the opinion that at the time of the alleged offense defendant was "so far free from mental disease or defect that she did not lack a substantial capacity to appreciate the criminality of her behavior or to conform her conduct to the requirements of the law."

■▌ The trial court found the defendant guilty of both charges and sentenced her to a term of 18 months' periodic imprisonment on the offense of involuntary manslaughter and 18 months' probation on the charge of theft, sentences to run concurrently.

## MENTAL STATE

Defendant initially contends that her conduct did not constitute "recklessness" so as to justify a conviction for involuntary manslaughter. She claims that she drove away from the scene with the intention of hurting herself but with the expectation that her child would be safe.

Section 4—6 of the Criminal Code of 1961 defines *recklessness* in the following manner:

> "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. An act performed recklessly is performed wantonly, within the meaning of a statute using the latter term, unless the statute clearly requires another meaning." Ill. Rev. Stat. 1977, ch. 38, par. 4—6.

The trial court specified six, separate, reckless acts committed by defendant which justified the conviction. We hold that the placing of a 2½-year-old child on the highway alone at night was a reckless act sufficient to sustain a conviction.

Defendant also claims that the child's death was "accidental" and that it was not foreseeable. The trial court determined, and we agree, that death or great bodily harm was a foreseeable result of defendant's reckless acts.

## INVOLUNTARY MANSLAUGHTER/RECKLESS HOMICIDE

Defendant next contends that the trial court erred in failing to dismiss the indictment for failure to charge an offense. She asserts that the trial

court lacked jurisdiction because the indictment alleged that she committed involuntary manslaughter with an automobile. Involuntary manslaughter is committed when:

"A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly, except in cases in which the cause of death consists of the driving of a motor vehicle, in which case the person commits reckless homicide." Ill. Rev. Stat. 1977, ch. 38, par. 9—3(a).

Prior to 1975, reckless homicide was an included offense of involuntary manslaughter. (Ill. Rev. Stat. 1971, ch. 38, par. 9—3(b); see also *People v. McCollough* (1974), 57 Ill. 2d 440, 313 N.E.2d 462.) Defendant argues that the change in the involuntary manslaughter statute was intended to indicate that any time death occurs and an automobile is involved, the offense is reckless homicide and not involuntary manslaughter.

We agree that the change in the statute was an attempt to delineate between the two offenses. We do not, however, accept the broad reading espoused by the defendant. We are not prepared to say that any time an automobile is involved—even incidentally—reckless homicide is committed. To do so would be effectively eliminating involuntary manslaughter as an offense in Illinois. Instead, we hold that in order for the event to constitute reckless homicide, the reckless act must consist of the method or manner in which the automobile is being operated.

■■ For example, recklessly discharging a shotgun from a passing automobile, causing death, would be involuntary manslaughter, whereas recklessly driving an automobile so as to overrun a pedestrian in the crosswalk, causing death, would constitute reckless homicide. In the instant case, the operation of the automobile was incidental to the reckless act which was the placing of the 2½-year-old child on the highway alone at night. Defendant was properly charged and convicted of involuntary manslaughter.

## JURY WAIVER

Defendant also claims that the record failed to affirmatively establish that she expressly and understandingly waived her right to a jury trial in open court. She was present in open court on April 4, 1978, and was advised of the nature of the charges, the possible penalties, her right to trial by jury, and the right to have counsel appointed. Upon her request, the public defender was appointed. The record contains a September 14, 1978, letter from defense counsel to the trial judge stating that defendant

was giving up her right to trial by jury and that if it was convenient, a jury waiver could be signed in open court on September 25, 1978, by defendant. There is no indication in the record that this was ever done. Both charges were consolidated and the bench trial began on November 6, 1978.

Section 103—6 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 103—6) provides:

> "Every person accused of an offense shall have the right to a trial by jury unless understandingly waived by defendant in open court."

Aside from the requirement of the statute, it has been held that there is a duty upon the trial court to ascertain whether the waiver of a jury trial is expressly and understandingly made. (*People v. Wesley* (1964), 30 Ill. 2d 131, 195 N.E.2d 708.) Furthermore, a purported jury waiver made by counsel outside of defendant's presence is ineffective. *People v. Coleman* (1978), 59 Ill. App. 3d 1050, 376 N.E.2d 277.

We agree with the defendant that the statutory requirements have not been fulfilled. We note, however, that this argument is being raised for the first time in this court. Thus, our examination is limited to the doctrine of plain error. Ill. Rev. Stat. 1977, ch. 110A, par. 615(a).

■■ We hold that although the statutory requirements were not fulfilled, the error here did not rise to the level of plain error. (*People v. Middleton* (1976), 43 Ill. App. 3d 1030, 357 N.E.2d 1238; *People v. Sheppard* (1974), 20 Ill. App. 3d 1036, 313 N.E.2d 287.) The defendant was advised of her right to a jury trial and was assisted by counsel, her case being originally set for a jury trial. A letter by defense counsel to the trial court expressed an intention to forego a jury trial. The absence of a formal waiver was obviously a ministerial oversight. The defendant proceeded to trial without objection and the matter was not raised in her post-trial motion. Defendant's only expressed desire for a jury trial arises here in this court.

Defendant also cites us to the landmark decision in *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709. There, in examining the sufficiency of a guilty plea, the Supreme Court declared that a waiver of crucial rights—such as the right to a jury trial—cannot be presumed from a silent record. In the instant case, there is more than mere silence. The record here contains the letter from defense counsel. Additionally, there is some question as to the application of *Boykin* to cases where there was no guilty plea. See *People v. Ceaser* (1974), 17 Ill. App. 3d 650, 307 N.E.2d 753.

## INTENT TO PERMANENTLY DEPRIVE

Finally, defendant claims that the State failed to prove the intent to permanently deprive the owner of the automobile of its use and benefit as

an element of theft. It is asserted that had it not been for the accident, it was extremely likely that defendant would have returned the car to the owner. This is completely contrary to the evidence at trial, which established that defendant was going to commit suicide by driving the car into a ditch.

Defendant claims that it is more reasonable that her temporary condition of pathological intoxication caused her to commit the illogical act of driving away in the automobile, rather than any intent to permanently deprive. The State points out that neither voluntary intoxication nor involuntary intoxication was raised as a defense at the time of trial, although defendant did raise the defense of insanity.

A review of the psychiatric evidence presented at trial reveals that two experts—Dr. Traugott and Dr. Pugh—both testified that defendant lacked a substantial capacity to conform her conduct to the requirements of the law. This testimony was rebutted, however, by Dr. Kiersch who testified that at the time of the alleged offense defendant was free from mental disease or defect and that she did not lack the substantial capacity to appreciate the criminality of her behavior or to conform her behavior to the requirements of the law. Additionally, Dr. Talbert testified that defendant did not have any severe memory deficit.

It would appear that there was conflicting testimony concerning defendant's capacity to form the required mental state. This, then, is a question of fact, and the trial court's decision as the trier of fact will not be disturbed in this court since it is amply supported by the evidence. *People v. Leverson* (1979), 69 Ill. App. 3d 726, 387 N.E.2d 931.

Affirmed.

GREEN, J., concurs.

Mr. JUSTICE TRAPP, specially concurring:

I concur in the affirmance of the conviction of involuntary manslaughter for reasons other than those stated in the majority opinion.

Upon this conviction the prosecution has the burden of proving the reckless act which caused the death. *People v. York* (1978), 57 Ill. App. 3d 243, 373 N.E.2d 90; *People v. Holland* (1973), 11 Ill. App. 3d 591, 297 N.E.2d 310; *People v. Yocum* (1970), 122 Ill. App. 2d 126, 257 N.E.2d 793; *People v. Manske* (1948), 399 Ill. 176, 77 N.E.2d 164.

The majority opinion concludes that the defendant's reckless act was the placing of the child out of the car on the highway in the dark. The record includes the testimony of a pathologist who described the brutal injuries and fractures which were consistent with the testimony of physical evidence that the child's arm was caught in the car door so that

he was dragged beside the car for several hundred feet. The record supports a jury's inference that death resulted from such conduct or act.

In the light of the evidence concerning the cause and manner of death, the act of the defendant in placing the child out of the car in the road in the nighttime does not suffice to establish the reckless act which caused death.