(No. 22625.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LEO ANGELICA, Plaintiff in Error.

*Opinion filed December 18, 1934.*

H. E. RAYMOND, (HARRY W. STANDIDGE, of counsel,) for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, HENRY E. SEYFARTH, and AMOS P. SCRUGGS, of counsel,) for the People.

Mr. CHIEF JUSTICE JONES delivered the opinion of the court:

Leo Angelica was found guilty by a jury in the criminal court of Cook county of the crime of obtaining money by means of the confidence game. He was sentenced to the penitentiary and now prosecutes a writ of error from this court.

The indictment contained two counts. The first count charged that on July 8, 1933, the defendant obtained from George W. Rust the sum of $250 by means and use of the confidence game. The second count charged a threat to accuse Rust of indecent exposure of his person in a public place, with intent to extort the sum of $250 from him. At the close of the testimony a *nolle prosequi* was entered as to the second count.

According to the testimony of the complaining witness, Rust, he was in Jackson Park, Chicago, on July 28, 1933, and went into some bushes to urinate. Afterwards he lay down in the shade and was either asleep or dozing when he was approached by the defendant, who grabbed him and ordered him to arise. The rough manner in which Rust was handled caused his trousers to become unbuttoned. The defendant wore a plain brown suit and held in his hand a star similar to that worn by uniformed police officers. He told Rust that urinating in the bushes of the park was a serious offense and ordered Rust to accompany him to the police station. As they were walking along Rust protested against his arrest and asserted that it was time for him to go to work, and that if he was compelled

to go to the police station and did not appear for work he would lose his job. He insisted that the charge was silly and that he could not afford to go to court. Defendant said: "Well, I'll tell you what I will do, Rust. You seem like a pretty clean-cut type. * * * I will give you a break in this case. I am not supposed to do that. It's dangerous and I wouldn't do it for anybody, but I like you, and I know the· clerk at this station and I will fix it up with you, have you put up a bond and it won't even appear in the record and you won't need to appear, and all you will have to do will be to call in thirty days for your bond. If you don't get in any more trouble with the police in thirty days you will get your bond back." The defendant then asked Rust if he had any money, to which question Rust replied that he had none with him but could get some by the next day. It appears that the defendant was demanding a deposit from Rust of $250. The next day they met and Rust paid the defendant $100. On the following Monday the parties again met, and when Rust told the defendant he did not have the rest of the money the defendant became angry and said, "That envelope is already made up, and if the $250 isn't in that I'm in a jam and I'll lose my job." Rust replied that he could get the money if given time. On the next day he and the defendant again met and drove around in an automobile for awhile, during which time Rust paid the defendant the balance of $150. He asked for a receipt, and the defendant said that he would get one from the clerk and would deliver it to Rust within five or six days. Rust never got a receipt and did not again see the defendant until February, 1934, after he had been arrested and was in custody.

The defendant, as a witness in his own behalf, testified he was an automobile mechanic by trade and had been employed in various other capacities for a number of years. He denied that he was in Jackson Park on July 28, 1933, and testified he had never seen Rust until February, 1934,

and that he had never received any sum of money from him or ever conversed with him. He denied all complicity in the crime charged.

The chief complaint against the judgment of conviction is that the guilt of the defendant was not proven beyond a reasonable doubt. Rust asked the defendant if there was any way the case could be fixed or handled, and it is claimed that he thereby initiated and helped to devise and carry out the alleged confidence game. If Rust's story is true the money was put up for the purpose of protecting him from legal prosecution and possible loss of his job. He made the payments because of the false pretenses of the defendant, which convinced Rust that he was under arrest and would be put on trial. The defendant designedly obtained Rust's confidence by telling him that he liked him, would give him a break in the case and would fix it up for him so that he could put up a bond without appearing in court, and the money would be restored in thirty days upon good behavior. "The confidence game statute was designed to reach that class of offenders known as confidence men, who practice swindling schemes as various as the mind of man is suggestive, upon unwary victims. The gist of the crime is the obtaining of the confidence of the victim by some false representation or device." (*People* v. *Peers,* 307 Ill. 539; *People* v. *Parker,* 356 id. 138; *People* v. *Perlmutter,* 306 id. 495; *People* v. *Gallowich,* 283 id. 360.) It covers any scheme whereby a swindler wins the confidence of his victim and then cheats him of his money or property by taking advantage of the confidence fraudulently obtained. (*People* v. *Rosenbaum,* 312 Ill. 330; *People* v. *Peers, supra.*) The facts detailed by Rust constitute the confidence game.

Rust's identification of the defendant is positive. We observe no reason for holding that his story is improbable or that the jury should not give it credence. There is nothing in the record to show that it differed from what he .

told the grand jury. Unless the uncorroborated testimony of a complaining witness is so improbable as to contain within itself its own impeachment, its weight, as well as the testimony of the defendant, is a question for the jury. We have frequently held that the testimony of one witness, even though denied by the accused, may be sufficient to sustain a conviction. (*People* v. *Schanda,* 352 Ill. 36; *People* v. *Fortino,* 356 id. 415.) This court will reverse a conviction on the evidence only when it is able to say, from a careful consideration of the whole testimony, that there is clearly a reasonable and well founded doubt of the guilt of the accused. (*People* v. *Greenberg,* 302 Ill. 566; *People* v. *Grosenheider,* 266 id. 324.) When the evidence is directly in conflict as to material facts, the most important and useful function of a jury is to determine on which side of the controversy the real truth lies. This court is not warranted in reversing the finding of a jury on the facts where no reversible error is shown and the evidence as a whole is sufficient to warrant the verdict. *People* v. *Coniglio,* 353 Ill. 643; *People* v. *Greenig,* 342 id. 254.

The indictment charges the offense was committed on July 28, 1933. Rust testified that the money was given to the defendant in installments some days afterwards. Every indictment must allege the commission of the offense on a certain date prior to the return of the indictment, which must be within the time fixed by law for the prosecution of the offense. It is not necessary, however, to prove the precise date as alleged unless the allegation of a special time is an essential ingredient of the crime or the running of the Statute of Limitations is involved. A slight variance as to the dates is immaterial. The indictment and the proof met all the requirements of the law. *People* v. *Rockola,* 346 Ill. 27; *People* v. *Kircher,* 333 id. 200.

We find no reversible error in the record, and the judgment of the criminal court is affirmed.

*Judgment affirmed.*