(No. 24761.— ▮▮▮▮▮▮▮▮)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MARY BIMBO, Plaintiff in Error.

*Opinion filed October 21, 1938—Rehearing denied Dec. 8, 1938.*

HAROLD L. LEVY, (WM. SCOTT STEWART, of counsel,) for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and BLAIR L. VARNES, of counsel,) for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

The defendant, Mary Bimbo, was indicted in the criminal court of Cook county for the crime of obtaining money

by means of the confidence game. She was tried by the court without a jury, found guilty, and sentenced to the Illinois State Reformatory for Women. Defendant prosecutes this writ of error.

On April 18, 1937, the prosecuting witness, Stanley Kozak, a resident of Kenosha, Wisconsin, together with his wife, two other women, and Julius Salaent, were in Chicago. A sign bearing the words "Fortune Teller" in the window of a store room at 1427 South Halsted street attracted the attention of the visitors. Defendant, garbed in gypsy clothes, standing in the doorway, invited the group to enter and have their fortunes told. From Kozak's testimony it appears that defendant told him he had experienced bad luck, that he was having trouble, and that, with his assent, she ordered the other persons to leave. When they had gone, defendant informed Kozak he was lucky to have come in as otherwise he would die very soon. As a cure for his trouble she directed Kozak to obtain some eggs, roll money around them, put them in a handkerchief which should be twisted, then place it and its contents in his pillow and, finally, sleep on them all night. Defendant further instructed Kozak to return to her with the eggs and the money three times. Kozak followed defendant's instructions and the next morning, April 19, returned from Wisconsin to the place where he had encountered her. He showed her the handkerchief which she opened. It contained a ten and a five-dollar bill, and the eggs. As a part of a cabalistic formula, the preliminary details of which need not be set forth, defendant told Kozak to boil the eggs in a glass of water. According to him, as the water approached the boiling point, "Then I kind of believe." Thereupon, defendant requested Kozak to bring a thousand dollars with him the next time he visited her, explaining that if she obtained money from him he would not die. When informed that he did not have the sum specified, she suggested that he borrow the money. On April 24, Kozak

returned to Chicago with $615 and visited defendant, conformably to her request, for the purpose of showing the money to her. On this third occasion she ordered him to buy a live rooster, telling him that perhaps the rooster would die in his place. Obediently, Kozak repaired to a butcher shop and purchased a rooster for $1.05. Defendant handled the fowl and when it appeared dead, proclaimed that the rooster's death had saved Kozak's life and that, otherwise, he would not have lived more than nine days. Following this ceremonial, defendant asked permission to handle defendant's money, promising to immediately return it. Kozak's testimony discloses that as defendant grabbed the handkerchief containing the money he turned around and she said to him, "Pete, that is your money," directed him to keep it on his person for nine days, and admonished him particularly to refrain from mentioning the matter to his wife or anyone else lest his sickness recur. Defendant commanded Kozak to return to her in nine days. The witness stated that he believed the promise made, and that, without again examining the handkerchief, went back to Wisconsin, and, complying with defendant's latest instructions, remained silent. On the eighth day, after informing his wife that he did not propose to go back to Chicago, Kozak put the handkerchief under his pillow and went to work. While he was at work his wife opened the handkerchief and found that it contained only a bunch of paper. Mrs. Kozak and a neighbor hastened to the foundry where her husband was employed and informed him that there was no money,—only paper,—in the handkerchief. Kozak returned to Chicago with two of the persons who had accompanied him on his initial visit to defendant. Upon ascertaining that the place where she had been operating was closed they reported the transaction to the police. When apprehended on May 26 defendant was accoutered in ordinary street clothes. The next day, Kozak identified defendant at the police station.

Angeline Kozak, wife of the prosecuting witness, and Salaent, corroborated Kozak with respect to defendant's invitation to enter her establishment and, likewise, positively identified her. Mrs. Kozak also confirmed her husband's testimony that he left their home in Wisconsin with $615, on April 24, when he went to Chicago.

Police officer John S. Hickey, who had known defendant for several years, testified that prior to April 24, 1937, he had seen her in a store at 1427 South Halsted street which she occupied together with other gypsies, and, in particular, that he had seen her there almost every day in April, 1937, until the latter part of the month when the store was empty. Officer Alfred Lauderdale testified that he had known defendant for more than four years; that it was part of his duty to watch the gypsies in the vicinity where defendant lived; that, in April, 1937, she occupied a store at 1427 South Halsted street alone, and that, by April 26, 1937, the store was abandoned.

Defendant testified in her own behalf, denying categorically that she ever had any dealings with Kozak, and, specifically, that she obtained money from him or told his fortune. According to defendant she had not told fortunes for eight years, although she had four daughters-in-law who did tell fortunes in April, 1937, at a store on Halsted street. She admitted that Kozak came and talked with her, making inquiry as to the whereabouts of a certain woman.

One of the contentions urged in support of a reversal is that the trial court erred in appointing the public defender as defendant's counsel on the day of the trial and refusing to grant her a further continuance. The record discloses that the indictment was returned against defendant on June 3, 1937, and that the hearing, on her motion, was continued five times between the day named and October 20, 1937. Two attorneys entered their appearances in June, 1937, and a third filed a petition for a change of venue on July 19, 1937, but did not enter his appearance of record. There-

after, defendant left the jurisdiction of the court and on October 20 her bond was forfeited. Subsequently, officer Hickey saw her in a court room in New York and brought her back to Chicago. The cause was re-instated on the trial docket on January 13, 1938, and was continued three times between that day and March 1, 1938, the day of the trial. Different lawyers from those previously referred to appeared as defendant's counsel and sought continuances for her on the last two occasions. Upon learning from his clerk that there had been about twelve continuances the court ordered the case to proceed to trial. Although it affirmatively appears that at various times prior to March 1, defendant had been represented in court by four,—if not more,—lawyers, she, nevertheless, appeared in court on the day named without counsel. Nor was she then represented by counsel of record. Manifestly, defendant had adequate opportunity to definitely decide which of her successive attorneys she desired to represent her, to prepare for trial and to *subpoena* witnesses. Under the circumstances narrated, and in the absence of an affidavit showing legal cause for further delay, the trial judge did not abuse his sound judicial discretion in denying defendant a further continuance. *People* v. *Mahoney,* 361 Ill. 202; *People* v. *Singer,* 288 id. 113; *Trask* v. *People,* 151 id. 523.

Defendant's contention that a jury was not properly waived cannot be sustained. The record shows that the counsel appointed to represent her, experienced and competent, consulted with her preparatory to the trial, and, after consultation, advised the court that defendant desired to waive a jury. She thereupon signed a waiver by affixing her mark. The record abundantly discloses that defendant not only expressly waived a trial by jury but, further, that her action in this regard was understandingly taken.

A variance between the allegations of the indictment that United States money was obtained, and the proof, is charged. The record fails to disclose any claim on the trial

that the money obtained by defendant from Kozak was not lawful money of the United States. An asserted variance between the proof and the indictment must be raised on the trial, or it will be deemed waived. *People* v. *Shaw,* 300 Ill. 451.

Defendant insists that the evidence does not sustain the judgment. Any scheme whereby a swindler wins the confidence of his victim and then cheats him out of his money by taking advantage of the confidence reposed in him is a confidence game. (*People* v. *Angelica,* 358 Ill. 621; *People* v. *Dore,* 339 id. 415; *People* v. *Epstein,* 338 id. 631; *People* v. *Bertsche,* 265 id. 272; *People* v. *DePew,* 237 id. 574; *Juretich* v. *People,* 223 id. 484; *Maxwell* v. *People,* 158 id. 248.) The gist of the crime is the obtaining of the confidence of the victim by some false representation or device. (*People* v. *Angelica, supra; People* v. *Peers,* 307 Ill. 539.) The character of the crime of obtaining money by means of the confidence game is not affected by and is complete irrespective of the amount, kind or value of money obtained. (*People* v. *Clark,* 256 Ill. 14.) Here, the proof shows that by use of false representations and other fraudulent devices the defendant secured the confidence of her unwary victim and as the proximate result of his misplaced confidence consummated her swindling operation by obtaining his money,—not to mention the eggs and the rooster. In particular, defendant gained the complaining witness' confidence by prophesying that his death was imminent and telling him that she would save him, and thereby induced him to participate in an exotic ritual, including the expiatory offering of the rooster. The evidence recounted conclusively demonstrates that defendant is guilty of obtaining $615 belonging to Kozak by means of the confidence game.

The judgment is affirmed.                    *Judgment affirmed.*