THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ARMANTE DEFELICE, Plaintiff in Error.

*Opinion filed April 10, 1941.*

J. E. GOEMBEL, and B. JAY KNIGHT, (FREDERICK H. HAYE, of counsel,) for plaintiff in error.

GEORGE F. BARRETT, Attorney General, MAX A. WESTON, State's Attorney, and WILLIAM H. GATES, for the People.

Mr. JUSTICE FARTHING delivered the opinion of the court:

Defendant, plaintiff in error here, was found guilty by a jury in the circuit court of Winnebago county of the crime of obtaining the money of Luigi DiMargio by means of the confidence game. He has sued out this writ of error to obtain a reversal of the judgment of conviction. He contends as grounds for reversal that it was not proved beyond a reasonable doubt that he received the money as charged in the indictment, it was not proved the money

was obtained by reason of confidence reposed by DiMargio in defendant, that the court permitted the examination of witnesses as to *aliases* other than those under which he was indicted, and that the court permitted the introduction of evidence tending to establish the commission of crimes other than the one for which he was indicted.

The indictment charged defendant and Peter Pallone with obtaining $2800 of Luigi DiMargio's money by means and by use of the confidence game. The indictment was *nolle prossed* as to Pallone and he testified for the People. All of the principals in the case are of Italian birth, and DiMargio and Pallone testified through an interpreter. Defendant did not testify. Neither DiMargio nor Pallone could read or write in English or Italian, and their testimony at times is somewhat obscure. However, from a careful reading of the record the following facts appear:

Early in the spring of 1939, Pallone and defendant met while living at the same rooming house in Rockford. Pallone and DiMargio had been friends for seventeen or eighteen years, and Pallone introduced defendant to DiMargio. The three of them got together frequently thereafter. Sometimes they would go for walks, sometimes they would have some drinks in a saloon at which places defendant always paid the bill, and sometimes they would meet at DiMargio's house in the evenings. Defendant boasted that he was a person of importance, claimed to know certain famous architects, and "flashed $20-bills around." He asked Pallone whether he had a postal savings account and was told that he did have. Shortly afterwards, defendant handed Pallone $900 to take care of for him. Later, when Pallone asked him to take it back, defendant replied it was safer in his hands than in a bank. Defendant talked about going into business with DiMargio, and one time they drove to a garage and defendant suggested that they buy it and go into business. At one time he offered to get DiMargio a better job than he then had. At another time he told

DiMargio his job would end within a week but told him they would go into business together.

Defendant told Pallone that he had an invention by means of which he could make perfect money that could not be distinguished from genuine "government" money. He handed Pallone and DiMargio a $5-bill which he claimed to have made and told them to go to a store and have it changed, to see if one experienced in handling money could tell the difference. They passed it without difficulty. DiMargio testified that defendant "kept coming after me," apparently meaning defendant kept trying to persuade him to go into the counterfeiting business. According to DiMargio, defendant found out how much money DiMargio had in the bank and wanted him to put up all his money so they could "take the numbers off of it" so as to have real numbers on the counterfeit money. On Saturday morning, April 15, the three of them met and proceeded to DiMargio's house, went into a bedroom and pulled down the shades. Defendant had a tin pan, various bottles filled with liquids, a package of papers, and an eyedropper. DiMargio got his $2000 and Pallone produced $1600, $700 of which was defendant's and $900 of which belonged to Pallone, and all of this was handed to defendant. Defendant told DiMargio to sit close to him and he would show him how it was done. Pallone tied a handkerchief over defendant's nose and mouth. The money was put in the pan and various liquids poured over it. At that time a strong odor emanated from the pan, causing DiMargio's eyes to burn and water, and he left the room. He testified the dizziness it caused lasted for three or four hours. Later Pallone told DiMargio to have his wife go to the post-office and get $800 she had in the postal savings and "put in" with them. DiMargio at first refused but later agreed. About an hour later his wife returned with $800 and that was also handed to defendant. Pallone left the room on an errand for defendant, and when he and Di-

Margio re-entered, defendant was tying up a package which he said contained the money, real and counterfeit. He told DiMargio to place the package in a suitcase so it could dry and not to open it until the following Monday. They then went out and got some beer and they all had lunch at DiMargio's. Monday Pallone and DiMargio went to defendant's hotel but he was gone. They then went to DiMargio's home and opened the suitcase, but found the package contained only blue paper. Some time later, defendant was arrested in Chicago. He denied having any such dealings with Pallone or DiMargio but admitted knowing them.

Defendant's argument that it was not proved defendant obtained the money is that he did not have access to the suitcase after the package supposed to contain the money was placed in it. The answer, of course, is that the jury was justified in believing the package which was placed in the suitcase did not contain the real money which had been handed over to defendant. Defendant, alone, was present when the package was wrapped, and in view of all the circumstances it is obvious he never wrapped up the money and turned it over to DiMargio. Nor is there merit to the contention the judgment must be reversed because defendant was indicted for obtaining the money of Luigi DiMargio in the sum of $2800 and the proof showed only $2000 of this belonged to DiMargio and $800 to his wife. If money is obtained by means of the confidence game the offense is complete without reference to the amount, kind or value. (*People* v. *Bimbo*, 369 Ill. 618; *People* v. *Clark*, 256 id. 14.) An asserted variance between the proof and the indictment must be raised on the trial, or it will be deemed waived. (*People* v. *Bimbo, supra; People* v. *Shaw*, 300 id. 451.) No question of variance was raised on the trial in this case. The evidence abundantly shows the element of confidence which is the gist of the crime. The facts of this case are much the same as those in *People* v.

*Zurek,* 277 Ill. 621, in which a conviction for obtaining money by the confidence game was sustained. The scheme employed by defendant is obvious. It is the one common in all confidence game cases, to meet the victim, pose as his friend, evince a desire to help him, show that you are a man of influence and ability who is in a position to help and after the victim is convinced of all this, to take advantage of the confidence so obtained. By his repeated visits with DiMargio, his representations that he was a man of importance with friends also of importance, with his announced desire to help DiMargio go into a business or get a better job, and by his display of money, he convinced DiMargio of his desire to help him and that he was a man of ability. His use of the $5-bill which he claimed to have made was bound to have made a tremendous impression on DiMargio, who was totally uneducated. We cannot believe DiMargio would have entered into such an enterprise except for the confidence defendant had deliberately and diabolically gained from him. Some effort is made to show DiMargio testified he did so because of fear of being harmed by defendant if he refused, and, therefore, not because of confidence in him. There is some language in DiMargio's testimony, which, standing alone, tends to substantiate that position. However, a reading of all of DiMargio's testimony on that point shows that he meant he was afraid of the law but nevertheless went into the scheme because he had confidence in defendant, and that he was not afraid that defendant would harm him.

Defendant was indicted as "Armante De Felice, *alias* Ormando Di Felice." In the motion to quash and motion for bill of particulars he designated himself Angelo DiVecchio. On the trial, detective George Luce testified concerning a conversation he had with defendant after his arrest, and said defendant told him his name was Angelo DiVecchio. He then stated he asked defendant if he had used a list of *aliases* which Luce read to him and defendant ad-

mitted he had. When Luce began to read the list, consisting of Angelo De Veto, Marty Marley, Mario Parmeto, and Pete Armando, objection was made and overruled. This is assigned as error. The objection should have been sustained, but in view of the strong evidence of guilt and the further fact that two names were included in the indictment and he admitted having used another *alias,* the error does not warrant a reversal. *People* v. *Baker,* 365 Ill. 328.

Defendant also complains of other isolated and unresponsive remarks by Luce which were improper. The court struck such statements, sometimes of its own motion, and told the jury not to pay any attention to them. The prejudice was thus largely removed, and in view of the record the judgment will be affirmed.

*Judgment affirmed.*