People of the State of Illinois, Defendant in Error, v. James Pompey, Plaintiff in Error.

Gen. No. 49,595.

First District, Fourth Division.
October 7, 1964.
Rehearing denied October 21, 1964.

Irving Bronstein and Eugene Lieberman, of Chicago (Eugene Lieberman, of counsel), for plaintiff in error.

Daniel P. Ward, State's Attorney, of Chicago (Elmer C. Kissane and Joseph R. Gill, Assistant State's Attorneys, of counsel), for defendant in error.

MR. JUSTICE McCORMICK delivered the opinion of the court.

James Pompey, defendant, was indicted for theft. A plea of not guilty was entered and the case was tried before a jury. The jury returned a verdict finding the defendant guilty. Defendant's post-trial motions were overruled; the court entered judgment on the verdict, and sentenced the defendant to three to six years in the Illinois State Penitentiary. From that judgment this appeal is taken.

The alleged errors relied on in this court by the defendant are that the State failed to prove him guilty beyond a reasonable doubt; that certain prejudicial testimony was admitted into evidence; that the court wrongfully denied defendant's motion for a list of witnesses before the trial, and permitted the unsworn testimony of the prosecuting witness to go to the jury.

Ernest Weinrich was the complaining witness. He testified that he and the defendant were coemployees and that the defendant had told him he would fix him up with a girl; that on October 7, 1962, Weinrich came to a tavern at 844 Montrose Avenue to meet the defendant at the defendant's request.* Just after midnight Weinrich accompanied Pompey to the latter's apartment in Room 202 at 839 Montrose Avenue. Thereupon, Pompey left Weinrich for five to fifteen minutes and came back accompanied by a girl about eighteen years old. Pompey left the girl and Weinrich alone in the room and went downstairs. Weinrich undressed but the girl did not. Weinrich asked her how old she was and she said she was twenty-six. She asked Weinrich for money; first $10, then $15, then $30; Weinrich agreed to pay her $30. The lights were on as Weinrich sat, unclothed, in the chair, and the girl,

---

* Weinrich testified that, in company with Pompey, he had eight or nine drinks of mixed vodka and orange juice.

clothed, sat on a couch. They discussed the divorce Weinrich had previously obtained. The door opened and a man came in with a badge. Pompey also came in. The man with the badge said "Vice Squad." Pompey and Weinrich then went into the bathroom where Pompey told Weinrich that since Weinrich had once been arrested for indecent exposure he could get five to ten years for his conduct that night in having the girl with him in Pompey's apartment. Pompey suggested that they talk to the alleged police officer about the possibility of his being paid off. When they talked to the alleged police officer he said he wanted $9,000 to forget about the incident. Pompey wrote a check for $4,500, and gave it to the alleged officer. Weinrich gave the officer a ring. The girl and the alleged officer then left.

Weinrich testified that he remained with Pompey the rest of the night and that about 5:30 in the morning they went to a restaurant on Montrose where they ate and talked. They then took a taxi to Weinrich's room where the prosecuting witness took $600 in cash from his dresser drawer. At 6 o'clock they went downtown and waited in the Walgreen Store in the Greyhound Bus Station until the banks opened. Weinrich then drew out $1,675 in cash and they went to a tavern on LaSalle Street, and Weinrich gave the $2,275 to Pompey. They then walked to the Continental Bank where Pompey's sister had an account. Pompey went upstairs alone and later told Weinrich that he had put the money in his sister's bank account. Weinrich gave Pompey the money to repay him for the check he had written and given to the alleged police officer.

They then went to the City Hall where the alleged police officer, who had given his name as "Foster," had told them to meet him in room 207. Foster did not appear at the room, and when they asked for him, no one knew him. Weinrich and Pompey then went home.

Their intent in seeking Foster was to give him additional money. Weinrich also testified that he saw the man, who had given his name as Foster, on Wednesday morning at Bryn Mawr and Broadway. He had called Weinrich and told him to meet him. Weinrich then gave him $300 more which he had borrowed from a finance company.

After Weinrich went back to work he talked to a friend of his who apparently raised some question in Weinrich's rather dimly lighted mind that the entire situation was not exactly as it appeared. Weinrich then went to the police, made a complaint, and Pompey was arrested. The police officer testified that he had arrested Pompey and that during his time on the police force he had never heard of an Officer Foster. Pompey was identified by Weinrich in the presence of the officer and Pompey remained mute. As a witness in his own behalf at the trial, Pompey denied the entire transaction. He admitted that he had been convicted of strong-arm robbery in 1956, had spent six years in the penitentiary, and presently was on parole. He testified that on October 7 he had no date to meet Weinrich, although he did see him in the tavern on Montrose Avenue. They had a few drinks, played the pinball machine, and about 8:30 or 9:00 p. m. Weinrich, Pompey and another man referred to as Cleve left the tavern. They helped Cleve move some of his chattels and then went back to the tavern. This was after 9:20 p. m. Cleve had been accompanied by his wife, and they left about 9:30. He came back about 10 o'clock. Weinrich left shortly after 10:00 and Pompey left about 11:00. The next time Weinrich saw Pompey was at 6:30 Monday morning.

Pompey testified that after he left the tavern he went home, which was directly across the street; that he was in his home and his sister and brother-in-law were also there. The doorbell rang at 6:30 a. m.; Wein-

122

rich was there, very excited, and asked Pompey to go downtown with him.* Pompey got dressed and went with Weinrich to a restaurant where they had break= fast. Pompey also testified that when he left the tav- ern at 11 o'clock he went to the apartment; that his sister and brother-in-law were watching television. He sat with them for a short time, then ate and went to bed. The next morning he went out with Weinrich. Weinrich was telling him a story of which Pompey could make nothing. They ate at the restaurant on Montrose and Broadway, then went downtown. Wein- rich said he had to see "Foster." When they got down- town they had something more to eat at the cafeteria in the Greyhound Bus Station. Weinrich left him for awhile and when he returned Pompey went home. He denied that he had ever been to the City Hall or to room 207 therein. He denied that Weinrich gave him any money or that he had asked him for any. After he was arrested the police officer asked Pompey if he knew anything about the episode and he said he knew nothing. He also said that he did not know a Chuck Foster. At the time the police showed Weinrich sev- eral pictures but he could not identify any of the pic- tures as Foster.

The man referred to as Cleve testified that he was at the tavern in question on the date in question. He arrived there about 6:30 or 7:30 p. m., and Pompey was there at the time. Afterwards he saw Weinrich. They stayed in the tavern at that time for about an hour and a half. At about 8:30 they left and Pompey and Weinrich helped Cleve move. The three of them then went back to the tavern, arriving about 9:30. Weinrich left about 10:00 and Pompey left about 11:00, and at that time there was no conversation with ref- erence to girls.

* Pompey had testified that he had never gone out with Wein- rich socially.

■

Pompey's sister testified on Pompey's behalf that she lived at 837 Montrose with her husband and two children; that Pompey had lived with them ever since he had come out of the penitentiary seven months before, and that he slept in the living room. She testified that on October 7 Pompey came home about 11:00 p. m. and went to bed shortly afterwards; that at 6:00 the next morning Weinrich rang the doorbell; that Pompey went to the door and she heard him talking to Weinrich. He then came back and told her it was Weinrich and that he, Pompey, had to leave. He got dressed and left.

Leonard Johnson, a policeman assigned to Internal Investigation in the Chicago Police Department, was called by the State as a witness in rebuttal, and he testified that he had made an investigation with regard to a complaint concerning a Chuck Foster; that he showed Weinrich photographs of the officer who had previously arrested him and he could not identify any of the pictures.

■ An indictment for theft (Ill Rev Stats 1961, c 38, § 16–1) was returned against the defendant. The defendant was given a copy of the indictment and a list of the names of the witnesses. On November 14, 1962, he was arraigned and, through his counsel, made an oral motion for the State to produce a list of witnesses who would be called to testify on behalf of the State. The court properly denied the motion. The defendant did not comply with the rule of the Criminal Court. There is nothing in the record which would indicate that the requirements of the rules were waived by the People.

■ The case was set for trial December 12. On that date the defendant made a written motion asking for a list of the jurors and the names of the witnesses, which motion was denied by the court. The defendant then moved for a bill of particulars, which motion

also was denied by the court. Again, in making the written motion of December 12, the defendant did not comply with the rules of the Criminal Court, nor did he serve any notice upon the State's Attorney. At the same time, the defendant filed a written motion for a bill of particulars without complying with the rules of the Criminal Court. The court denied the motions. The State's Attorney furnished the defendant with a list of jurors. The Illinois Criminal Code (Ill Rev Stats 1961, c 38, § 729) provides that every person charged with felony shall be furnished, previous to his arraignment, with a list of the jurors and witnesses. The motions made by the defendant complied neither with the rules of the Criminal Court nor with the statute.

Sgt. Leonard Johnson, whose name did not appear on the list of witnesses given to the defendant, was permitted to testify in rebuttal over the objection of the defendant. In the indictment the defendant was charged with the crime of theft by deception (Ill Rev Stats 1961, c 38, § 16–1 of the Criminal Code, which takes the place of the old crime of confidence game, c 38, § 256).

In People v. Brady, 272 Ill 401, 112 NE 126, a case in which the indictment was for confidence game and was in the terms of the statute, the court held that the section of the Criminal Code states what is necessary to constitute the offense, and where that is true the indictment charging the offense in the language of the statute is sufficient. The court further says:

". . . . A bill of particulars will not aid a bad indictment, and by the decisions of this court one is not required to be given under an indictment charging the confidence game in the language of the statute, either to enable the accused to know what he is charged with or that he may plead the

judgment in bar of another prosecution for the same offense. [Citing cases.]"

The court further holds that the court might, in its discretion, order that a bill of particulars be furnished to the defendant.

■ In People v. Montgares, 347 Ill 562, at 565, 180 NE 419, the court holds that a bill of particulars is not necessary where the indictment informs the defendant of a crime with which he is charged sufficiently to enable him to prepare his defense. The court further holds that whether a bill of particulars shall be required rests in the sound discretion of the trial court, and unless there has been a clear abuse of this discretion the denial of such a motion will not constitute error. In the instant case that rule was complied with and there was no abuse of discretion.

■ The only witness about whom the defendant complains, whose name was not given to the defendant was Sgt. Johnson. He was permitted, over objection, to testify in rebuttal.* The evidence of Sgt. Johnson brought out by the State on direct examination was no different from testimony which had been given by the other police officers.

■ Counsel also objects to the fact that Sgt. Johnson was permitted to testify that the defendant had refused to give the police a statement with regard to the offense. However, that testimony was brought out on cross-examination by the defendant and no

---

* In the Code of Criminal Procedure 1963, effective Jan 1, 1964, section 114-9 provides that the court upon request shall order the State to furnish the defense with a list of prosecution witnesses and their last known addresses. Subsection (c) of this section states:

"The requirements of subsection (a) of this section shall not apply to rebuttal witnesses."

complaint can be raised with reference to it. (People v. Kissane, 347 Ill 385, 179 NE 850.)

■ The defendant also objects that the two other police officers testified that the defendant, while in police custody, refused to give a statement with reference to the alleged happening, and in support of that contention cites People v. Rothe, 358 Ill 52, 192 NE 777, where the court held that the admission of such testimony was prejudicial. However, in the instant case, the counsel for the defendant, on direct examination, asked him whether the officer had asked the defendant if he knew anything about "participation in this alleged episode, "What did you say, if anything?" The defendant said he knew nothing about it. On cross-examination the State's Attorney asked the defendant, over objection, whether or not the defendant told the police anything and the defendant said he did not. The prejudice, if any, was first injected in the trial by the defendant. The defendant further states that another officer testified in response to a question of the State's Attorney that he had attempted to talk to the defendant but was unsuccessful. No objection was interposed by the defendant. The rule is that where in a trial a timely objection is not interposed, the error, if any, is not preserved for review. People v. Sinclair, 27 Ill2d 505, 190 NE2d 298.

■ There was also some question raised during the trial as to whether or not Weinrich had been sworn before he testified. The record furnished this court shows that Weinrich was sworn. The deputy court clerk testified that he had administered a proper oath to Weinrich before his testimony. At that time the court suggested that the defendant could make a motion for a mistrial. Counsel for defendant said that he did not desire to make such a motion. Having

127

taken that position, he cannot now raise before this court any alleged errors of the trial court which could have been corrected in the manner suggested by the trial judge.

The only other contention made in this court is that the defendant was not convicted by proof beyond a reasonable doubt. In support of this contention the defendant cites three cases: People v. Qualls, 21 Ill2d 252, 171 NE2d 612; People v. Silva, 405 Ill 158, 89 NE2d 800; and People v. Nelson, 360 Ill 562, 196 NE 726, all of which are rape cases in which the rule is laid down that where the prosecutrix in such a case testifies without corroboration and the facts to which she testifies are denied by the defendant, a conviction cannot be upheld. In People v. Angelica, 358 Ill 621, 193 NE 606, the court held that unless the uncorroborated testimony of a prosecuting witness is so improbable as to contain within itself its own impeachment, its weight, as well as the testimony of the defendant, is for the jury, and that the testimony of one witness contradicted by the defendant may be sufficient to sustain a conviction. See also People v. Schanda, 352 Ill 36, 185 NE 183.

In People v. Bimbo, 369 Ill 618, 17 NE2d 573, the defendant was indicted for the crime of obtaining money by means of a confidence game. The case was tried before the court without a jury and the defendant was found guilty. The story told by the prosecuting witness is bizarre. He came from Kenosha, Wisconsin, and went to a storeroom on Halsted Street in Chicago, where the words "Fortune Teller" appeared. The complaining witness testified that he had been having bad luck and wanted to have something done about it. The defendant told him he was lucky he came to her; otherwise, he would die very shortly. She told him to get some eggs, roll money around them, put them in a handkerchief and place it and its

contents in his pillow and sleep on them all night. She further instructed the witness to return to her three times with the eggs and the money. He followed her instructions and then brought her the handkerchief which contained a ten-dollar and a five-dollar bill and the eggs. The defendant then told the witness to boil the eggs in a glass of water, following a cabalistic formula which she outlined to him; and that the next time he came to her he should bring a thousand dollars; that she told him if he followed her instructions he would not die. The complaining witness was not able to raise a thousand dollars, but brought $615 to the defendant. At that time she instructed him to buy a live rooster, telling him that the rooster would die in place of the complaining witness. He bought a rooster and took it to the defendant who handled it, pointed out that it was dead and told him she had saved his life. She then asked the witness to let her handle his money, promising that she would immediately return it to him. She took the handkerchief containing the money, gave him back a handkerchief and told him to keep it on his person for nine days. When the handkerchief was opened by the complaining witness it contained only a bunch of paper.

The defendant, testifying in her own behalf, denied categorically that she had ever had any dealings with the complaining witness, and specifically denied that she had obtained money from him or told his fortune. The court held that the evidence was sufficient to sustain the conviction.

See also People v. Perroni, 14 Ill2d 581, 153 NE2d 578.

■ In People v. Luckett, 24 Ill2d 550, 182 NE2d 696, the court held that the credibility of a witness is primarily for the jury in a jury trial, and the reviewing court will not reverse a conviction depending on

credibility unless such action is necessary to avoid apparent injustice.

In The People v. Hornady, 400 Ill 361, at page 365, 81 NE2d 168, the court says:

> "The evidence concerning the defense of alibi is not such as to warrant our disturbing the judgment. The time plaintiff in error left his wife and the time prosecutrix was first accosted are shown to be not far apart. Neither is claimed to be exact. The reasonable doubt which will acquit a prisoner when his defense is an alibi is the doubt of guilt which arises from a consideration of all the evidence including the criminating evidence introduced by the prosecution as well as that touching the question of alibi. Carlton v. People, 150 Ill 181; Flanagan v. People, 214 Ill 170, 178."

In The People v. Bote, 379 Ill 245, 40 NE2d 55, the court says:

> ". . . In this case, it was necessary for the jury to determine which witnesses were telling the truth and which were not, and in determining this question the jurors had the right to take into consideration, and presumably did so, the manner in which the witnesses testified as well as their conduct and demeanor on the witness stand. . . . after a careful consideration of all the facts and circumstances in this case we cannot say that all defendants have not been proved guilty beyond a reasonable doubt and that the verdict of guilty should not be sustained."

In The People v. Tielke, 259 Ill 88, 102 NE 229, the court approved an instruction given to the jury to the effect that

". . . It was not the province of the jury to go beyond the evidence to hunt up or entertain doubts that were merely chimerical or conjectural; that to justify an acquittal a doubt must arise from a candid and impartial investigation of all the evidence in the case, and if, after considering all the evidence, the jury can say they have an abiding conviction of the truth of the charge, then they are satisfied beyond a reasonable doubt."

In the case before us the story told by the complaining witness is somewhat fantastic, and yet, considering the apparent mental capacity of the witness, it is not unbelievable. He testified that the sister of the defendant lived across the street from the tavern. After the defendant had told the complaining witness that he would procure a girl for him he took him to apartment 202. The defendant states that he lived with his sister, but there is no indication as to whether or not her apartment was 202 or whether there was another apartment which was utilized by defendant for the purpose of bilking the complaining witness.

The defendant testified that he had no close social contacts with the complaining witness; nevertheless, he testified that the complaining witness came to his home at an early hour in the morning asking him to go with him and telling him what the defendant designates as an incomprehensible story. The testimony of the complaining witness is that he remained in the company of the defendant through the entire night. Both witnesses are in agreement that at an early hour in the morning they had lunch at a restaurant in the near vicinity. The jury might properly infer that the defendant, believing that there might be a possibility that employees of the restaurant might testify to the fact of this breakfast meeting, used as an explanation the improbable story that the

complaining witness, with whom he claimed he had very little contact, came to his house in the early morning, at about 6:30, and told him he was in trouble; that the defendant dressed and went with him to a restaurant where they had breakfast.

In our opinion, the defendant was proved guilty beyond a reasonable doubt.

Much has been said in the books about the necessity of a defendant accused of a criminal offense having a fair trial. However, when a crime is committed the person against whom it is committed is the real sufferer. In the trial of a criminal case the State represents the People, including the victim of the crime in question. It cannot be gainsaid that the defendant standing in the dock should be entitled to all the rights protecting his interest with which the law surrounds him, but it is also true that the People represented by the State's Attorney are equally entitled to a fair trial. The scales of justice must be evenly balanced.

The American Bar Association has recently appointed a committee to engage in a 3-year project, the purpose of which is reported to devise minimum standards "which will preserve the vigilant concern for the rights of accused persons and at the same time assure that law enforcement is not unduly hampered in protecting the rights of society against those who would prey upon it."

The judgment of the Criminal Court of Cook County is affirmed.

Affirmed.

ENGLISH, P. J. and DRUCKER, J., concur.