The People of the State of Illinois, Defendant in Error-Appellee, v. William Vernon Bailey, Plaintiff in Error-Appellant.

Gen. No. 49,693.

First District, Fourth Division.

March 10, 1965.

Rehearing denied April 5, 1965.

Ralph A. Mantynband and E. T. Cunningham, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Kenneth Gillis, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

This is an appeal taken by William Vernon Bailey, defendant, from a judgment entered in the Criminal Court of Cook County. The judgment was entered on the verdict of the jury finding the defendant guilty of the crime of voluntary manslaughter. By the judgment the defendant was sentenced to a term of not less than ten nor more than twenty years in the Illinois State Penitentiary.

In this court the defendant contends that the verdict is contrary to the manifest weight of the evidence,[*] and that the defendant was denied due process of law since he was denied counsel.

The defendant was indicted for voluntary and involuntary manslaughter; he pleaded not guilty to each

---

[*] Undoubtedly, counsel means that the defendant was not convicted beyond a reasonable doubt.

* See Callaghan's Illinois Digest, same topic and section number.

of the charges, and the jury returned a verdict finding him guilty of voluntary manslaughter. Since it is here argued that the verdict of the jury was against the manifest weight of the evidence it becomes necessary to consider the evidence in some detail.

The case was tried before a judge and jury. The defendant testified that he had been married to one Dorothy Bailey, the deceased, in June 1949. They had lived together as husband and wife, residing in a large apartment building equipped with an automatic elevator, on Palmer Avenue in the City of Chicago. On the morning of June 16, 1963, the defendant left home, leaving his wife in bed reading the Sunday paper. At about 9:25 that evening the defendant returned to his apartment. During the day he had been drinking at a tavern on Leland Avenue. When he entered the apartment the premises were dark except for one small 25-watt lamp on a table. The defendant testified that he was intoxicated at the time.

When he entered the apartment the defendant saw his wife lying on the bedroom floor. He picked her up, placed her in bed and got into the same bed with her. At about 2:00 or 2:30 in the morning of June 17, the defendant awoke, shook his wife and tried to waken her. He then noticed that she was bruised in the face, and he could not waken her. He telephoned a friend and told him there was something wrong with his wife. His friend advised him to call the police or fire department for an ambulance, but this advice he did not follow.

He stated that he then took off the housecoat which his wife was wearing—and which was introduced in evidence at the trial—and dressed her in a skirt and dress. He noticed that there was blood under her nose and that her face was black and blue, and there was

blood on her legs. He went into the kitchen, got a cloth and wiped off the blood.

When the ambulance driver and his assistant arrived the defendant told them his wife was in the bedroom, and the ambulance driver, after he saw her, said she was dead. The defendant further testified that he went back to the living room and blanked out, remembering nothing further.

He stated that the next thing he remembered was that he was driving down the Ryan Expressway, and that he went to a tavern in Cicero, where he had several drinks and purchased some liquor. He fell asleep on the bar and was awakened by the bartender who told him to get a room in a hotel. He took the liquor he had purchased and went to a hotel. He testified he remembered going out of the room once or twice, but nothing else. He woke up in the hotel room and found a man occupying one of the twin beds. The man told him that he, the defendant, had run into him the day before and invited him to stay over night. Concerning this, the defendant testified he had no recollection.

Defendant further said that when he checked out of the hotel he had only six cents. The two men went to the defendant's car and the stranger drove it to Chicago and parked it in a lot between Monroe and Adams Streets. They took some tools from the car to a shop on Madison Street where the stranger pawned them and gave the defendant $3.

The defendant stated he tried to telephone his home but received no answer. He then called a man he knew who told him his wife was in the County Morgue and that the authorities were looking for the defendant to charge him with murder. He testified that he started to drink again, found a room where he spent the night, and the next day got a job with a chemical company where he worked all day. His job

264

was to move 50-pound paper bags containing chemicals, taking them out of a baggage car, putting them in a trailer, then taking them out of the trailer and putting them into other trailers. He worked there nine hours.

The defendant testified that in 1958 he had been in Manteno for treatment for drinking, and that he now decided to go there again. He called the same friend with whom he had spoken previously and told him he was "turning himself in out there." He also asked the man to get him a lawyer, and told him he was going over to Manteno. His friend told him to call back if he was unable to check in at Manteno. The defendant went to the hospital, gave his name to a woman in charge, and she told him to sit down and he would be able to see a doctor. The defendant testified that he got so sick he couldn't wait, and went out and rejoined his companion in the car. The companion drove him back to a tavern in Manteno and left him. From the tavern the defendant again called his friend in Chicago, asked him about getting a lawyer, and the friend said there was one there who would talk with him. The friend then put Detective Mahoney on the 'phone and the defendant talked with him, thinking that he was a lawyer. He told the detective where he was and when he left the tavern he was arrested and brought back to Chicago.

The defendant testified that he and his wife had no trouble in their marriage and that on the morning of June 17 he had not struck his wife. He said that his wife had fallen out of bed twice and that each time he had put her back in bed. On cross-examination he testified that when he first left the house the day of the homicide his wife had no facial bruises, nor did he notice anything wrong with her chin or her nose; that when he left the apartment the last time he did not know whether his wife was alive or dead; and he

said that between 9:30 p. m. and 2:00 a. m. he slept and heard no outcries from his wife.

The driver of the ambulance testified on behalf of the State that the call to go to the defendant's apartment had come through an undertaker who had called the ambulance service where he was employed. He rang the bell and someone from upstairs unlatched the downstairs door. When he got to the apartment the door was open. The apartment looked as if it had been ransacked. He saw a bedroom and a woman lying in bed. She had black and blue marks all over her body, and she was badly beaten about the face. He found no heart beat. The defendant then walked in, identified himself, and said his wife had fallen down a flight of stairs and he wanted to get her to a hospital. The witness told him she was dead. The defendant went over to his wife, picked up her arm and tried to shake her. He shoved the witness and ran out of the apartment, after which the witness chased him into an alley.

The witness testified that at that time the defendant was wearing a white shirt and blue trousers and that he had scratch mark bruises on his hands up to about his elbows. The witness stated that he was familiar, through his experience as an ambulance driver, with persons under the influence of alcohol; that he detected no smell of alcohol on the defendant, and that in his opinion the defendant was sober at the time. He further described the condition of the living room to the effect that furniture was turned over, lamps were knocked down, and drawers pulled out. He also stated that as he drew up in front of the apartment in his ambulance he saw two men standing in front of the building, and he saw a black Cadillac automobile circle the block a couple of times when he was chasing the defendant. He reported the presence of the car to the police.

266

Frank Schira, a police officer, testified that he arrested the defendant on June 24, 1963, in a tavern in Manteno, Illinois.

James Lanners, a police officer of the City of Chicago, assigned to the Homicide Unit, went to the apartment of the defendant. At that time he saw the driver of the ambulance and his assistant. He saw the deceased lying on the bed and noted bruises on her face and a large discoloration across the right breast. There were abrasions and small lacerations on her arms and she was bleeding from the mouth and nose and from the vagina. There were stains of blood on the sheet and pillow case and on the woman's housecoat. He saw a wet towel on the window sill in the bathroom which had stains that he thought were blood. All of the stained articles, together with a man's shirt and trousers, were sent to the Crime Lab for examination.

The witness did not see the defendant until after he was arrested and at that time, in the opinion of the witness, the defendant had been drinking. The witness noticed that the defendant was wearing two shirts, and these, together with the trousers he was wearing, were sent to the Crime Lab. The witness also testified that he noticed small healed scratch marks on the defendant's arms.

The witness stated that he checked the stairways at the apartment building and found nothing there that resembled blood stains. On cross-examination he testified that he had searched the neighborhood to locate a dark Cadillac altomobile but was unable to find it. He also testified that the marks which he saw on the left wrist and right wrist of the defendant were scabbed, and that there was a small healed scratch on the back of the left wrist which was about one-half inch long, and there were also healed scratches on both of the defendant's arms. On redirect the

267

witness testified that he had examined both doors leading into the apartment and found no evidence of a forcible breaking.

Dr. Harold Wagner, who in June 1963, was Chief of Pathology in the Cook County Coroner's Office, testified that he had performed an autopsy on the deceased; that he found red tissue, purple swelling and discoloration of the left eye, the left cheek and the lips; that there were small cuts on the surface of the lips and the face, and bruises on the inside of the lips. There were fresh bruises on the jaws and on the chest, particularly at both breasts, and on the left thigh. He also testified that there were "some crusted, older scabs, bruises, on both knees, as I recall, and one elbow . . . . And there were several older scab bruises on the chest."

The internal examination disclosed, among other things, that the larynx had hemorrhaged and that there was an extensive hemorrhage over the sixth vertebra and the cervical vertebra was found to be fractured; and that in the vagina there was some hemorrhage due to a tear of the lining. The witness testified that there were four rib fractures on the right on the front; that two of these ribs had fractures at the point of attachment to the spinal column; and that, in his opinion, the deceased died of a fractured neck with damage to the spinal column, associated with the various bruises and rib fractures. He testified that the bruises and lacerations were caused by blows of some kind and that the hemorrhages of the neck were of the kind usually associated with an attempted strangulation; that the laceration of the vagina was obviously caused by the attempt to penetrate it with some object, causing "some trauma, some force." He stated that the findings with reference to the sexual organs would be similar in type to those found in a case of forcible rape; that there was

an abnormal extension of the bladder with urine; that that condition is caused by the emergency action taken by the human body when it is frightened, "particularly the closing of the sphincters of the body, in preparation for flight. This is called the fright or flight defense mechanism."

The witness testified that he examined the fingernails and submitted the clippings to the Crime Lab, and that he did not recall there being any blood there; that death would come in less than an hour following a fracture of the cervical vertebra.

On redirect examination, he testified that the tear of the vagina could have been caused by any blunt instrument or fingers.

Dean Bilton, an Assistant State's Attorney, testified that on June 22, 1963, he saw the defendant at the Homicide Area No. 5; that the defendant told him then that he had been drinking and did not remember how he got home; that when he came home his wife was already in bed, dressed in a housecoat. The defendant further said that he got into the bed; that his wife kept falling out of the bed and that he kept "throwing her back on the bed." He stated he thought she was having delirium tremens; that he then went to sleep and when he woke up he thought there was something wrong with his wife and called an ambulance. When it arrived the driver told him his wife was dead. The defendant said he was scared and ran away. Then he described his flight until he was arrested in Manteno. He also stated that he did know there was no one else in the apartment but himself and his wife while he was there.

The Assistant State's Attorney testified that at that time the defendant was in good physical shape; not intoxicated, and seemed normal in his speech. The defendant also told him he had not been having trouble with his wife.

A stipulation was introduced in evidence concerning the analysis at the Chicago Crime Laboratory; that the articles received from Dr. Wagner were examined; that on examination it was found that the vaginal swab contained no evidence of spermatozoa; that of the articles which had been received from Detective Lanners who had testified, the bedsheet, pillow case, housecoat, man's trousers, all contained human blood; that the sport shirt revealed no trace of blood; and that the fingernail clippings showed no blood nor flesh.

 The first question to be considered is whether the defendant was deprived of due process of law inasmuch as he was deprived of the assistance of counsel. In his brief he argues that when he had called a friend who told him he had a lawyer there who would talk to him, the supposed lawyer was a detective. The only thing that appears in the record with reference to the conversation of the defendant and the detective was that the detective, through the conversation, discovered the whereabouts of the defendant and then proceeded to arrange for his arrest. Defendant's argument that the detective, in stating that he was an attorney, deprived the defendant of the assistance of counsel, is without merit.

The cases of Coplon v. U. S., 191 F2d 749, and Caldwell v. U. S., 205 F2d 879, cited by defendant, are not applicable. We are not passing on the question of whether or not the conduct of the Police Department was unethical or illegal in misrepresenting facts to the defendant in order to find out where he was so that he might be arrested. It certainly was not illegal. In his brief counsel for the defendant said:

"The days of the sporting aspects of criminal justice are fast drawing to a close. The rules of the game are quickly being modified to put the

270

accused on a par with the State. U. S. v. Jencks, 1 L Ed2d 1103."

While we may be approaching it, we have not yet reached the stage where the law enforcement officers of the State must regard a person accused of crime (no matter how old he is or what record he may have) as an innocent boy with a low mentality.

Defendant cited Escobedo v. Illinois, 378 US 478, where the United States Supreme Court said, at page 490:

> . "We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution . . ."

The rule laid down in that case is not applicable here. There was nothing introduced in evidence to show that the defendant made any statement to the officer other than to indicate the place where he was at the time. If the argument of the defendant was carried to its logical conclusion the defendant could remain immune from arrest and the law enforcement officers would not be able to investigate his whereabouts. The argument is as absurd as to say that police departments should be prevented from putting their officers in plain clothes because it might

deceive a person who has committed a crime and is avoiding arrest.[1]

■ The next question which must be determined is whether or not the conviction of the defendant was against the manifest weight of the evidence. It is incumbent upon the State in the first instance to prove the corpus delicti. In People v. Manske, 399 Ill 176, 77 NE2d 164, at 183, the court said:

". . . The rule as to what constitutes the corpus delicti has been announced many times. In a trial for murder it consists of two parts or essen-

[1] In a speech given before the Annual Meeting of the New York State Bar Association in New York, Mr. Lewis F. Powell, Jr., President of the American Bar Association, discussed the study which is being made, under the auspices of the American Bar Association, of criminal law and justice. In that speech Mr. Powell said:

"The right to a fair trial, with all that this term implies, is one of our most cherished rights. We have therefore welcomed the increased concern by law enforcement agencies and the courts alike in safeguarding fair trial.

"The question is the delicate one of balance. The right of society in general, and of each individual in particular, to be protected from crime must never be subordinated to other rights. There is a growing body of opinion that the rights of law abiding citizens are being subordinated. The pendulum may have swung too far in favor of affording rights which are abused and misused by criminals. There are valid reasons for criminals to think that crime does pay, and that slow and fumbling justice can be evaded."

In People v. Pompey, 53 Ill App2d 118, 203 NE2d 52, we said:

"Much has been said in the books about the necessity of a defendant accused of a criminal offense having a fair trial. However, when a crime is committed the person against whom it is committed is the real sufferer. In the trial of a criminal case the State represents the People, including the victim of the crime in question. It cannot be gainsaid that the defendant standing in the dock should be entitled to all the rights protecting his interest with which the law surrounds him, but it is also true that the People represented by the State's Attorney are equally entitled to a fair trial. The scales of justice must be evenly balanced."

tial elements,—the fact of death, and the fact that death was produced by the criminal agency of some person. (People v. Bentley, 357 Ill 82; People v. Hanson, 359 Ill 266.) Both of these elements must be established beyond a reasonable doubt. (Citing cases.) The corpus delicti consisting as it does of proof of death and of a criminal agency does not in itself include the person who committed the crime, although it is one of the elements necessary to be proved beyond a reasonable doubt to convict the defendant. . . ."

In the case before us there can be no question that both mentioned elements of the corpus delicti (the same for manslaughter as for murder) were proved beyond a reasonable doubt. It then becomes necessary for the State to prove that the defendant committed the crime. The defendant's statements with reference to his conduct on the day of the crime are in conflict. The proof adduced by the State with reference to the commission of the crime by the defendant is circumstantial. People v. Martishuis, 361 Ill 178, 197 NE 531; People v. Buskievich, 330 Ill 532, 162 NE 196.

The defendant testified that at the time he came home he found his wife lying on the floor. He subsequently made a statement that he found her in bed. He testified that he was intoxicated, but the jury, applying their experience in the affairs of life, could conclude that the intoxication of the defendant was not of such a stupefying degree as to prevent him from noticing, when he lifted his wife into bed as he testified, that she was practically dripping with blood and near to death. His testimony with reference to her repeated falls out of bed could be taken by the jury at its face value. The injuries were not so produced. There was no evidence whatsoever that any other person was present in the apartment until the ambulance driver arrived.

273

■ The actions of the defendant after he had determined that his wife was either dead or close to death were, to say the least, peculiar. He did not call the police or fire department for an ambulance although he had been advised so to do. He washed the blood away and changed his wife's blood-stained clothes. When the ambulance arrived he made an entirely false statement to the driver to the effect that his wife had fallen downstairs. At the time it might have been in the mind of the defendant that the beating he had given his wife had not extinguished the last spark of life. However, when he was told that she was dead he immediately took refuge in flight. His flight is a circumstance tending to prove his guilt, and there was no sensible explanation as to why he had fled except that he feared the consequence of his crime. People v. Rappaport, 362 Ill 462, 200 NE 165.

The driver of the ambulance testified that at the time he came to the apartment the defendant was sober. The defendant testified that as soon as the driver told him that his wife was dead he "blacked out"; however, the blacking out was not so complete that he failed to remember he had left his wife's watch on the floor. He also remembered very clearly his adventures after he fled the scene of the crime.

In the instant case, the grand jury did not indict the defendant for murder. Had he been so indicted, and had the jury on the evidence in the record returned a verdict of guilty, it should have been sustained. Had he been indicted for murder the burden of going forward with the evidence for the purpose of showing that he was guilty of manslaughter instead of murder would have devolved upon the defendant. The defendant here was indicted for both voluntary and involuntary manslaughter and was arraigned and tried upon both charges.

Voluntary manslaughter is defined in Ill Rev Stats 1963, c 38, § 9–2, as follows:

"(a) A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation . . .

"Serious provocation is conduct sufficient to excite an intense passion in a reasonable person."

The sentence prescribed is imprisonment in the penitentiary from one to twenty years.

Involuntary manslaughter is defined in section 9–3 of the same statute as follows:

"(a) A person who kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly."

The sentence set out is imprisonment in the penitentiary from one to ten years.

██ The defense strenuously argues that the defendant could not properly be convicted of voluntary manslaughter since there is nothing in the evidence from which the jury could have found that he was acting through a sudden and intense passion resulting from serious provocation. The statute defining voluntary manslaughter finds its ordinary application in a case where there is an indictment for murder and where the defendant is attempting to have the jury find him guilty of the lesser offense of manslaughter. It is logical to say that proof that he acted in sudden anger is not sufficient, and so the legislature provided that it must be shown that the anger resulted from sufficient provocation. Where there is no indictment

for murder and the indictment is for voluntary manslaughter, the requirements of the statute are not so logical. The burden is placed upon the State to prove that the act resulted from sudden and intense passion produced by sufficient provocation. The latter provision, setting out provocation as an element of the crime, makes the State's burden difficult and sometimes impossible, and yet a failure to prove provocation is fatal to the State's case. However, we must follow the statute and any change is a matter for the legislature and not the courts. There is in the case before us no evidence as to provocation, and thus the State has failed to prove one of the elements of voluntary manslaughter.

It has been held that where a person is indicted for murder and found guilty of involuntary manslaughter he cannot complain if the evidence was of such a character to justify the court in finding the defendant guilty of murder. People v. Green, 23 Ill2d 584, 590, 179 NE2d 644; People v. Wiggins, 12 Ill2d 418, 426, 147 NE2d 80.

In the case before us, considering all the evidence and also bearing in mind that both the trial court and the jury saw and heard the witnesses, we are of the opinion that the defendant was proved guilty of killing the deceased, beyond a reasonable doubt. People v. Sudduth, 14 Ill2d 605, 153 NE2d 557. In People v. Hartwell, 341 Ill 155, 173 NE 112, the court said:

"... Defendant also offered no evidence to satisfactorily explain how the decedent came to be found in such helpless and critical condition on the floor of his front bedroom. All these circumstances and controverted questions of fact were submitted to the jury. After hearing his testimony and observing the manner and character

of all the witnesses the jury found the defendant guilty. The trial judge by denying a motion for a new trial and entering judgment against defendant has certified his approval of the verdict."

People v. Washington, 27 Ill2d 104, 187 NE2d 739; People v. Manske, 399 Ill 176, 77 NE2d 164; People v. Bartell, 386 Ill 483, 54 NE2d 700.

In finding the defendant guilty the jury indicated that it did not believe the testimony of the defendant but had inferred from all the circumstances that defendant had killed his wife. This being so, it can be inferred from the uncontradicted evidence that the acts which caused the death of Mrs. Bailey were administered recklessly.

The defendant complains that during the trial the State did not turn over to the defendant copies of certain statements given by witnesses to the police officers during their investigation. The defendant filed a motion for a bill of particulars. That motion was sustained in part by the court. The State furnished defendant's counsel a list of its witnesses and a copy of statements made by the defendant. In so doing the State complied with the order of the court and the statute, Ill Rev Stats 1963, c 38, §§ 114–2 and 114–9. In People v. Turner, 29 Ill2d 379, 194 NE2d 349, it is held that it is well settled that the production of documents is restricted to impeachment purposes only. During the examination of one of the police officers he mentioned that he took statements from both ambulance drivers. Counsel for defendant then demanded that he produce the statements, but stated that he wanted them only for informative reasons and did not need them for impeachment purposes. (Peculiarly, the statement that the defendant's counsel did not need them for impeachment purposes is

omitted from the abstract.) There was no indication that these documents could properly be used for the purpose of impeachment. As a matter of fact, there is nothing showing in the record that a ruling of the court was made on the defendant's request. Upon this proceeding the defendant cannot predicate error.

In the case before us it must be remembered that the jury had before it evidence that the defendant had scratch marks on his arms immediately after the killing, and that the deceased had on her body the scabs of old bruises (this was not denied or explained by the defendant) from which the jury might draw an inference that the relationship between the deceased and the defendant was not as harmonious as the defendant's testimony would indicate.

In People v. Walker, 55 Ill App2d 292, 204 NE2d 594, where an appeal was taken by the defendant from a conviction of murder and where the evidence was sufficient to sustain a conviction for voluntary manslaughter, the court discussed section 121-9, The Cause on Appeal, of the Code of Criminal Procedure, 1963 (Ill Rev Stats c 38, § 121-9), which in subparagraph (b)(3) of that section provides that the reviewing court may "Reduce the degree of the offense of which the appellant was convicted." The court found that under the evidence the defendant was guilty of voluntary manslaughter and remanded the case to the Circuit Court with directions.

██ ██ We will take advantage of the same authority which the legislature has provided. We reverse defendant's conviction for voluntary manslaughter, but since we find that under the evidence the defendant was guilty of involuntary manslaughter we will remand the case to the Circuit Court with directions to enter a finding of guilty of involuntary manslaughter and to impose a sentence for that crime appropriate to the facts and circumstances of the cause

278

and to whatever other matters in aggravation or mitigation may be made available to the trial court.

Reversed and remanded with directions.

ENGLISH and DRUCKER, JJ., concur.